48 March 2, 2020 No. 3

## IN THE OREGON TAX COURT
## REGULAR DIVISION

OOMA, INC.,
a foreign corporation,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 5331)

On cross-motions for summary judgment concerning Oregon's E911 Tax under ORS 403.200(1), Plaintiff, a provider of Voice over Internet Protocol services, argued that it was not subject to the E911 Tax and that imposing the E911 Tax would violate the Due Process and Commerce Clauses of the United States Constitution. The court held that Plaintiff was a provider required by statute to collect the tax from its consumers. Further, the court found no violation of the federal Due Process Clause because Plaintiff maintained sufficient minimum connections with Oregon to satisfy even the most rigorous of the various tests outlined by US Supreme Court cases. *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 US 873, 877, 131 S Ct 2780, 180 L Ed 2d 765 (2011). Finally, the court found that imposition of the E911 Tax did not offend the Commerce Clause because a substantial nexus existed between Oregon and Plaintiff, and the measurement of the E911 Tax (a per line charge) was fairly related to Plaintiff's Oregon activities and not excessive.

Oral argument on cross-motions for summary judgment was held January 17, 2019, in the courtroom of the Oregon Tax Court, Salem.

Casey M. Nokes, Cable Huston LLP, Portland, and Michael J. Bowen, Akerman LLP, Jacksonville, filed the motion and argued the cause for Plaintiff.

James C. Strong, Assistant Attorney General, Department of Justice, Salem, and Darren Weirnick, Senior Assistant Attorney General, Department of Justice, Salem, filed the motion and argued the cause for Defendant.

Decision for Defendant rendered March 2, 2020.

**ROBERT T. MANICKE, Judge.**

### INTRODUCTION

Plaintiff Ooma, Inc. (taxpayer) provides national interconnected Voice over Internet Protocol (VoIP) services,

including to customers in Oregon. Defendant Department of Revenue (the department) has issued to taxpayer notices of assessment of the tax imposed under ORS 403.200 (the "E911 Tax") in amounts totaling $677,444.88, including penalties and interest as of August 30, 2016. Taxpayer appeals from an adverse decision in the Magistrate Division, and the parties have filed cross-motions for summary judgment on largely stipulated facts. The periods at issue are the quarters ending March 2013 through March 2016.

## II.  ISSUES

(1)  Is taxpayer subject to the E911 Tax under Oregon law?

(2)  Does the Due Process Clause of the United States Constitution prohibit the department from subjecting taxpayer to the E911 Tax?

(3)  Does the Commerce Clause of the United States Constitution prevent the department from subjecting taxpayer to the E911 Tax?

## III.  FACTS

The following facts are not in dispute. Taxpayer is a foreign corporation with its commercial domicile and principal place of business in Palo Alto, California. Taxpayer provides VoIP services to customers across the United States, including to residents of Oregon. Taxpayer also provides additional telecommunications services to Oregon customers that include voicemail, call waiting, call forwarding and caller identification.

Taxpayer's VoIP equipment allows Oregon customers to conduct voice communications via a high-speed (broadband) internet connection. In order to access taxpayer's VoIP services, Oregon residents must first purchase taxpayer's equipment ("VoIP Equipment") either directly from taxpayer via taxpayer's website, through independent third-party retailers with locations in Oregon, or through independent online retailers, including Amazon.

When taxpayer's customers use the VoIP Equipment to make a call, the digital data sent from taxpayer's call initiator is processed through one of several regional data centers; otherwise the call is sent via broadband internet connection.

During the periods at issue, Oregon customers were required to enter into a contract ("Terms and Conditions") as a condition of accessing taxpayer's VoIP services. Taxpayer prepared marketing plans that targeted customers nationwide, including Oregon residents. Taxpayer also provided promotional and marketing materials to select national retailers for use in their retail locations, including retail locations in Oregon. During the periods at issue, taxpayer made recurring billings to Oregon customers. Taxpayer did not file returns for the E911 Tax with the department for the periods at issue.

Solely for purposes of the parties' cross-motions for summary judgment, the department does not dispute taxpayer's assertions that during the periods at issue: (1) none of taxpayer's employees visited Oregon; (2) taxpayer did not hire or compensate anyone to act on its behalf to promote or sell its VoIP services to Oregon residents; (3) taxpayer did not participate in any court proceeding or any legal or collection action in Oregon; (4) taxpayer owned no real or tangible personal property in Oregon; and (5) taxpayer did not possess any license, permit, registration, or authorization issued by any entity, government, or organization in the State of Oregon. The court will discuss additional facts as relevant.

## IV.   ANALYSIS

### A.   *Summary Judgment Standard*

The court grants a motion for summary judgment only if "the pleadings * * * declarations, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." Tax Court Rule (TCR) 47 C. *See Christensen v. Dept. of Rev.*, 23 OTR 155 (2018) (citing *Two Two v. Fujitech America, Inc.*, 355 Or 319, 331, 325 P3d 707 (2014)).

"No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable [factfinder] could [find] for the adverse party on the matter that is the subject of the motion for summary judgment." TCR 47 C. The adverse party has the burden of producing evidence on any issue raised in the motions as to which the adverse party would have the burden of persuasion at trial. *Id*.

## B.  *Statutory Background*

Oregon imposes the E911 Tax on each person with access to Oregon's emergency communications system (commonly known as the "9-1-1" system), whether through VoIP or through a wired or wireless telecommunications service. *See* ORS 403.200(1) (imposing tax), ORS 403.105 (definitions).[1] As discussed below, ORS 403.215(1) requires a provider of a telecommunication service or of equipment with access to the system to collect the E911 Tax from customers and remit the payment to the department.[2] The E911 Tax is codified in ORS chapter 403, which begins with a policy statement that reflects the role of the emergency communications

---

[1] For the reasons discussed below, unless otherwise noted, all references to the Oregon Revised Statutes (ORS) are to the 2015 edition. ORS 403.105(8) defines the "emergency communications system" as the network, database, servers, other equipment, and services that provide the means to communicate with a primary public safety answering point to request and provide assistance to preserve human life or property.

[2] As amended by Or Laws 2014, chapter 59, section 1a, the statutes distinguish between, on the one hand, "sellers" and "consumers" of *prepaid wireless* telecommunications service, and on the other hand "providers" and "subscribers" of all other kinds of telecommunications service. *See* ORS 403.105 (definitions). Taxpayer does not sell prepaid wireless service and therefore is a "provider," and its customers are "subscribers." Unless expressly stated, this order does not further address "sellers" or "consumers." The same 2014 act also specified that the E911 Tax is imposed on subscribers who have VoIP service, and those amendments "apply to telecommunications service or interconnected Voice over Internet Protocol service, as defined in ORS 403.105, provided on or after October 1, 2015." Or Laws 2014, ch 59, § 8a. However, taxpayer does not argue that the omission of a specific reference to VoIP providers before the 2014 act, or any of the later changes to the statutes, affects its obligations with respect to any part of the periods at issue. *See* Or Laws 2015, ch 247, § 1 (amending, *inter alia*, policy statement in ORS 403.100); Or Laws 2017, ch 27, § 1 (interest computation); Or Laws 2019, ch 653, § 1 (increasing tax rate).

system in public safety.[3] Revenue from the E911 Tax is used solely to maintain and improve the system. *See* ORS 403.245(1).[4]

In 2005, the Federal Communications Commission (FCC) adopted regulations requiring all VoIP providers to ensure that their users have access to local emergency services when making 9-1-1 calls.[5] *See* E911 Requirements for IP-Enabled Service Providers, *First Report and Order and Notice of Proposed Rulemaking*, 20 F.C.C.R 10266, ¶ 37 (2005), https://transition.fcc.gov/cgb/voip911order.pdf (accessed Jan 29, 2020), 70 Fed Reg 43323-01, 2005 WL 1749493 (F.R.) (July 27, 2005), *codified as* 47 CFR § 9.5. The parties agree that those federal regulations required taxpayer to provide its Oregon subscribers access to Oregon's emergency communications system during the periods at issue.

C.  *Discussion of Arguments*

    1.  *Taxpayer's statutory argument*

Taxpayer first argues that it owes no E911 Tax because the statute "imposes" the charge only on a "subscriber"

---

[3] ORS 403.100 provides:

"It is the policy of the State of Oregon to:

"(1) Encourage and support the development of public safety networks and an emergency communications system and the rapid deployment of broadband or other communications services in areas of the state in which the services do not exist;

"(2) Support redundancy of critical communications assets in order to ensure homeland security protections in the state; and

"(3) Ensure that a secure conduit is available for the emergency communications system and public safety networks in all Oregon communities."

[4] ORS 403.245(1) provides, in part:

"[M]oneys received under ORS 403.240(8) may be used only to pay for planning, installation, maintenance, operation and improvement of the emergency communications system as it relates to getting an emergency call from a member of the public to the primary public safety answering point and in transmitting the information from the primary public safety answering point to the secondary public safety answering point or responding police, fire, medical or other emergency unit by telephone, radio or computerized means."

[5] *See generally Nuvio Corp. v. F.C.C.*, 473 F3d 302, 303 (DC Cir 2006) (describing the difficulties associated with "nomadic" service provide by interconnected VoIP providers; noting the "tragedies" that gave rise to the FCC's 2005 order requiring VoIP service companies to provide their subscribers access to local emergency communication systems).

of VoIP services, *i.e.*, taxpayer's customers. *See* ORS 403.200(1)-(2). This argument asks the court to ignore numerous statutes that require a "provider" such as taxpayer to "*collect*" the tax from customers, "*remit*" the tax to the department, keep "*records*" of the tax, and file "*returns*" with the department, all while holding the proceeds "*in trust*" for the benefit of the State of Oregon. *See* ORS 403.215(1)-(2); ORS 403.225(1)-(2). Applying the analytical approach in *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009), the court is not aware of a dispute about the meaning of any part of the statutory text in isolation.[6] Rather, the dispute is about the meaning of the text in its context. A brief examination of the foregoing statutes shows that the legislature has elected to deputize providers to administer the E911 Tax, much as the legislature for decades has required employers to collect and remit tax, and file reports on their employees' wages, for purposes of the personal income tax, which provides the overwhelming majority of this state's general fund. *Cf.* ORS 316.167 (requiring employer to withhold tax from wages); ORS 316.197 (requiring employer to remit withheld tax); ORS 316.168 (requiring employer to file returns); ORS 316.207(1) (employer holds withheld tax in trust for State of Oregon). In fact, a provider plays an even more central role with respect to the E911 Tax: while individuals, including those whose personal income tax liability is fully satisfied by wage withholding, still must file annual tax returns, in the case of the E911 Tax no statute requires a provider's customer to file a return. Instead, a "return made by the provider or seller collecting the tax must be accepted by the Department of Revenue as evidence of payments by the consumer or subscriber \* \* \*." ORS 403.200(6).[7]

Taxpayer's main statutory argument distills to the notion that Oregon law allows it to disregard without consequence its express statutory duty to collect and remit the E911 Tax, simply because the legislature has chosen to *also*

---

[6] Nor has either party proffered any legislative history regarding taxpayer's statutory argument.

[7] In the case of prepaid wireless telecommunications service, only a consumer "from whom the tax has not been collected" is required to file a return. *See* ORS 403.217.

tag customers with liability if taxpayer fails to perform its duty.[8] Taxpayer's statutory argument fails.

2.  *Does the due process clause prohibit the department from subjecting taxpayer to the E911 Tax?*

Having concluded that Oregon law purports to require taxpayer to pay over any amounts of E911 Tax it should have collected from its customers, the court turns to taxpayer's argument that the requirement violates the Due Process Clause of the United States Constitution. *See* US Const, Amend XIV. Taxpayer acknowledges that its marketing plans and business strategies "targeted customers nationwide, including Oregon residents." However, taxpayer contends that, because its efforts did not "intentionally or specifically target[] Oregon residents," the Due Process Clause prevented Oregon from acquiring jurisdiction to impose tax on taxpayer. Essentially, taxpayer argues that, because it targeted everyone in the nation, it did not target anyone in Oregon—at least not sufficiently to create nexus under the Due Process Clause. The court easily concludes that Oregon's imposition of the E911 Tax on taxpayer is consistent with the guarantee of due process. As the United States Supreme Court recently summarized, "[i]n the context of state taxation, the Due Process Clause limits States to imposing only taxes that 'bea[r] fiscal relation to

---

[8] Taxpayer also argues that ORS 403.230(1) confirms that it owes nothing because it has not collected the E911 Tax from its customers. Taxpayer relies on the closing sentence: "As to any amount *collected* and required to be remitted to the Department of Revenue, the tax is considered a tax upon the provider or seller required to collect the tax and that provider or seller is considered a taxpayer." ORS 403.230(1) (emphasis added). Contrary to taxpayer's argument, this sentence does not excuse a provider from its positive, unambiguous duty to collect the tax as stated in ORS 403.215(1). Rather, this sentence *presumes the provider will comply* with that duty.

Taxpayer asks the court to ignore the context of ORS 403.230(1) as a whole. Like similar provisions in other excise tax statutes, ORS 403.230(1) simply imports by reference the established and well-developed administrative provisions of income tax law rather than inventing new such provisions. *Cf.* ORS 320.330 (statewide lodging tax); ORS 320.405 (privilege tax on vehicle dealers); ORS 320.555 (transportation tax on employers and certain payers). In order to apply those personal income tax provisions to an excise tax such as the E911 Tax, it is necessary to specially define the term "taxpayer." Otherwise, the narrow definition in ORS 316.022(7) (essentially, one who owes personal income tax) would apply by default, sowing confusion. In other words, the true purpose of the sentence taxpayer seizes on is simply to clarify that the term "taxpayer" as used in the imported administrative provisions includes a "provider."

protection, opportunities and benefits given by the state.'" *N. Carolina Dept. of Rev. v. The Kimberley Rice Kaestner 1992 Family Tr.*, ___ US ___, 139 S Ct 2213, 2220, 19 Cal Daily Op Serv 5832 (2019) (quoting *Wisconsin v. J. C. Penney Co.*, 311 US 435, 444, 61 S Ct 246, 85 L Ed 267 (1940)).[9] The controlling question is "whether the state has given anything for which it can ask return." *Id.* at 2220 (citation omitted); *see also Quill Corp. v. North Dakota,* 504 US 298, 312, 112 S Ct 1904, 119 L Ed 2d 91 (1992), *overruled on other grounds*, *South Dakota v. Wayfair, Inc.*, ___ US ___, 138 S Ct 2080, 2092-93, 201 L Ed 2d 403 (2018) ("Ultimately, only those who derive 'benefits and protection' from associating with a State should have obligations to the State in question.").

  *Kaestner* reiterated the Court's longstanding two-step analysis to decide whether a state tax abides by the Due Process Clause. First, a court must test for "minimum contacts," *i.e.*, "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax *** such that the tax does not offend traditional notions of fair play and substantial justice." *Kaestner*, ___ US at ___, 139 S Ct at 2220 (citations and internal quotation marks omitted); *see also Quill*, 504 US at 312 ("Due process centrally concerns the fundamental fairness of governmental activity. *** We have, therefore, often identified 'notice' or 'fair warning' as the analytic touchstone of due process nexus analysis."). Second, "the income attributed to the State for tax purposes must be rationally related to values connected with the taxing State." *Kaestner*, ___ US at ___, 139 S Ct at 2220. The court now applies this analysis.

  The first step, the minimum contacts inquiry, "is flexible and focuses on the reasonableness of the government's action." *Id.* The approach used to determine whether *in personam* jurisdiction lies also applies in cases involving a state's jurisdiction to tax. *Quill*, 504 US at 308-09. Under that approach, "[i]t is settled law that a business need not have a physical presence in a State to satisfy the demands of due process." *Wayfair*, ___ US at ___, 138 S Ct at 2093 (citation

---

[9] *Kaestner*, decided after oral argument in this case, provides a helpful summary of the due process analysis but is otherwise inapposite due to its factual dissimilarity.

omitted). Rather, the required minimum contacts may be present if the taxpayer "purposefully avails itself" of the state's market and thereby of the benefits and protections that a state provides by its laws and other infrastructure. *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 US 873, 877, 131 S Ct 2780, 180 L Ed 2d 765 (2011) (plurality opinion) (quoting *Hanson v. Denckla*, 357 US 235, 253, 78 S Ct 1228, 2 L Ed 2d 1283 (1958)). However, the United States Supreme Court opinions on the meaning of "purposeful availment" have been fragmented. Justice Brennan, writing for himself and three other Justices concurring in the judgment in a 1987 products liability case, would have held that the "regular and anticipated flow of products from manufacture to distribution to retail sale" that he found in that case sufficed to establish minimum contacts with California. *See Asahi Metal Industry Co. v. Superior Court of Cal., Solano Cty.*, 480 US 102, 116-17, 107 S Ct 1026, 94 L Ed 2d 92 (1987) (Brennan, J., concurring in part and concurring in the judgment). Justice O'Connor, writing for a different plurality, would have required "something more" than a manufacturer's mere awareness that its product would enter the forum state through the stream of commerce. *Id*. at 111-12 (O'Connor, J., plurality opinion).

More recently, the plurality opinion in *Nicastro*, authored by Justice Kennedy, would have looked to "whether the [foreign manufacturer's] activities manifest an intention to submit to the power of a sovereign." *Nicastro*, 564 US at 882. The plurality also stated its test as whether the defendant's actions "target[] the forum" and as "whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign \*\*\*." *Id*. at 882-84. As examples of conduct that would evince such an intention, the Court cited "direct[ing] marketing and sales efforts at" the state and advertising in the state, as well as having an office within the state, paying taxes in the state, or owning property there. *Id*. at 885-86. Justice Breyer's opinion concurring in the judgment in *Nicastro* concluded that the foreign manufacturer's sale of only one item into New Jersey negated either any "regular \*\*\* flow" or the "something more" referred to in the competing plurality opinions in *Asahi*. *See id*. at 888-89 (citations

omitted) (Breyer, J., concurring). Justice Breyer declined to join the plurality opinion in *Nicastro* and instead would have decided that case in favor of the manufacturer without "announc[ing] a rule of broad applicability \* \* \*." *Id.* at 887.

Taxpayer devotes much of its argument to explaining why three of the four opinions discussed above do not apply,[10] and why one of them (the Kennedy plurality opinion in *Nicastro*) should control.[11] The court concludes that under any of the tests articulated in *Asahi* or *Nicastro*, taxpayer purposefully availed itself of Oregon's market. The nature of taxpayer's business as a seller of ongoing services, the number and dollar volume of taxpayer's Oregon sales, and the pattern of their growth, show contacts that were sufficiently targeted to Oregon to satisfy any of the tests. During the three years at issue, taxpayer billed its Oregon subscribers a total of $2,807,135.90 on recurring cycles. Taxpayer's "total \* \* \* product orders made by Oregon customers \* \* \* during the Period" were "$758,094.96," and its total "recurring billings *and* product orders for Oregon residents during the Period" were "$2,768,405.78." (Emphasis added.) During the same period, taxpayer had thousands of VoIP lines in Oregon and its revenue from Oregon customers increased from $601,112.19 in 2013 to $1,152,233.39 in 2015.[12] These

---

[10] There are others. Justice Stevens wrote separately in *Asahi* and would have declined to reach the minimum contacts issue. 480 US at 121. Justice Ginsburg wrote a dissenting opinion in *Nicastro* and would have allowed jurisdiction in any state where a product is sold and caused injury. 564 US at 893-910.

[11] Taxpayer also criticizes the Oregon Supreme Court's decision in *Willemsen v. Invacare Corp.*, 352 Or 191, 282 P3d 867 (2012), *cert den*, 568 US 1143 (2013), for applying a "regular flow" or "regular course of sales" standard. The court sees no need to address this argument because the court concludes that taxpayer's contact satisfies any of the United States Supreme Court's minimum contacts tests and because taxpayer's contact far exceeds that of the defendant in *Willemsen*.

[12] The department provided a chart, recapitulated below, with four columns showing the "Number of VoIP Lines in Oregon, Product Sales to Oregon customers, Recurring Service Billings to Oregon customers," and "Total Monthly Revenue from Oregon customers" ("Chart"). The department determined the amount of VoIP lines in Oregon by dividing the "per month tax" by $0.75. In its response brief, taxpayer takes issue with statements in the department's cross-motion, asserting in part that the department failed to note in its reference to the Chart that "one customer may use multiple lines for VoIP service." Taxpayer contends that one VoIP line does not equal one customer. Taxpayer also notes that the portion of the Chart listing the dollar value of equipment sales to Oregon customers lacks a frame of reference and does not reflect the parties' stipulation that Oregon customers can purchase taxpayer's VoIP Equipment

amounts far exceed those at issue in *Nicastro*, which involved a single sale[13] (or, at most, four sales[14]) into New Jersey at a price of $24,900 per unit.[15] In this case, taxpayer's thousands of lines and its revenue from Oregon customers of nearly $1 million per year dwarf the in-state activity of the manufacturer in *Nicastro*.[16]

Applying the test Justice Brennan articulated in *Asahi*, not only was the "flow" of products and services "regular and anticipated," but most of the revenues as well were based on regular monthly subscriptions and actually increased from one quarter to the next. Turning to Justice Breyer's reasoning in *Nicastro*, taxpayer's sales and revenues also vastly exceeded the "single sale" of $24,900 on which Justice Breyer relied in seeking to apply precedent involving isolated sales.[17] And to the extent that "purposeful availment" might require "something more" than taxpayer's awareness that its goods or services were entering Oregon through the stream of commerce, as Justice O'Connor

---

from several sources; nor does it explain the price of the VoIP Equipment purchases on a per unit basis. Taxpayer then notes, without explanation, that the "issue of lines v. customers and the average price of equipment sold to Oregon customers is important in light of the department's reliance on the holding in *South Dakota v. Wayfair, Inc.*, 138 S Ct 2080." As will be explained further below, given the extent of taxpayer's overall connection to Oregon during the periods at issue, the court concludes that none of these points creates a genuine issue of material fact sufficient to preclude summary judgment in the department's favor. *See, e.g.*, *Jones v. General Motors Corp.*, 325 Or 404, 413, 939 P2d 608 (1997) ("In deciding whether a genuine issue of fact exists, courts generally read 'genuine issue' to mean 'triable issue[.]'" (Internal quotation marks and citations omitted.)).

[13] *See Nicastro*, 564 US at 889 (Breyer, J., concurring in the judgment) (referring repeatedly to a "single sale").

[14] *See id.* at 878 (plurality opinion) (one to four machines).

[15] *See id.* at 894 (Ginsburg, J., dissenting) (stating sales price per unit).

[16] The quantities and dollar amounts at issue in *Asahi* are less clear, but between 20,000 and 100,000 of the department's tire valve stems appear to have ended up in California stores per year. *See id.*, 480 US at 106 (Asahi sold 100,000 to 500,000 valve stems to distributor, which sold 20 percent of that stock into California).

[17] Taxpayer's sales also dramatically exceeded the approximately $30,929 that defendant China Terminal & Electric Corp. received from selling 1,102 battery chargers into Oregon over a two-year period, amounts that the Oregon Supreme Court found sufficient to satisfy the minimum contacts requirement in *Willemsen*. *See* 352 Or at 196 (citing Justice Breyer's opinion concurring in the judgment in *Nicastro*).

posited in *Asahi,* taxpayer's exclusively direct interactions with its Oregon customers fulfill that requirement. (There is no evidence that taxpayer used a distributor or other intermediary.)

Finally, to the extent that taxpayer accurately declares that the most restrictive test, Justice Kennedy's opinion in *Nicastro*, controls here, the evidence of taxpayer's business model as a service provider clearly shows that taxpayer has "targeted" Oregon as a market through a "course of conduct." Taxpayer earned the great majority of its Oregon income from *recurring billings* for telephone service and related services. At a minimum, taxpayer's periodic billing of customers proves that taxpayer had "fair warning" that revenue was coming from existing customers in Oregon.[18] Nor is that revenue stream purely the product of blindly casting a wide net through generic broadcast or Internet advertisements. Unlike the remote sellers in *Asahi* or *Nicastro*, taxpayer's business model depends in large part on cultivating an *ongoing* relationship with its customers, each of which provides a stream of monthly revenue and the prospect to increase that stream. Taxpayer's standard form of contract indicates that customers are not "locked in" to receiving their phone service from taxpayer, except to the extent that taxpayer's contract with a particular customer may specify a minimum initial term.[19] If taxpayer fails to satisfy a customer, therefore, taxpayer risks losing the customer's monthly revenue to a competitor. Yet, as shown in the Chart below, over the course of the periods at issue taxpayer not only doubled the number

---

[18] The court takes an example from one of the stipulated exhibits:

"The term for each Service will begin on the date it is activated and will continue until the Service is terminated by you or by us, as is more fully set forth herein. Notwithstanding the preceding sentence, in some cases, the description of the Services or the pricing for the Services may provide for or require an initial minimum term. Likewise, the sale of an item of Equipment at a particular price may require as a condition a minimum initial term for a Service."

Customer generally may terminate with five days' notice and is liable for charges for service through date of termination.

[19] The facts here leave no doubt that taxpayer specifically had "fair warning" that Oregon's E911 Tax would apply as well. Taxpayer's Terms and Conditions included language notifying its subscribers that they would be subject to "911 fees."

of lines in Oregon, from 6,633 in January 2013 to 13,467 in March 2016, it also increased the average monthly service revenue it derived from *each* line substantially, by around 30 percent:

| Month/ Year | Number of VoIP Lines in Oregon | Product Sales to Oregon customers | Recurring Service Billings to Oregon customers | Total Monthly Revenue from Oregon customers |
|---|---|---|---|---|
| Jan 2013 | 6,633 | $16,082.01 | $33,507.64 | $49,589.65 |
| Feb 2013 | 6,790 | $14,224.46 | $32,967.47 | $47,191.93 |
| Mar 2013 | 6,987 | $13,210.67 | $33,843.44 | $47,054.11 |
| Apr 2013 | 7,167 | $14,821.45 | $36,082.81 | $50,904.26 |
| May 2013 | 7,334 | $14,438.36 | $35,971.98 | $50,410.34 |
| Jun 2013 | 7,549 | $11,669.15 | $35,253.42 | $46,922.57 |
| Jul 2013 | 7,747 | $15,248.11 | $33,887.25 | $49,135.36 |
| Aug 2013 | 7,985 | $13,483.38 | $32,222.04 | $45,705.42 |
| Sep 2013 | 8,162 | $12,027.78 | $36,448.84 | $48,476.62 |
| Oct 2013 | 8,390 | $20,597.43 | $37,052.04 | $57,649.47 |
| Nov 2013 | 8,575 | $14,730.82 | $38,126.52 | $52,857.34 |
| Dec 2013 | 8,853 | $17,496.89 | $37,718.23 | $55,215.12 |
| Jan 2014 | 9,043 | $17,785.00 | $42,778.21 | $60,563.21 |
| Feb 2014 | 9,178 | $15,287.30 | $43,507.99 | $58,795.29 |
| Mar 2014 | 9,409 | $13,754.89 | $42,851.97 | $56,606.86 |
| Apr 2014 | 9,667 | $18,251.94 | $45,548.31 | $63,800.25 |
| May 2014 | 9,891 | $13,877.21 | $48,731.28 | $62,608.49 |
| Jun 2014 | 10,052 | $18,114.76 | $47,207.67 | $65,322.43 |
| Jul 2014 | 10,229 | $21,620.19 | $43,763.36 | $65,383.55 |
| Aug 2014 | 10,383 | $15,903.28 | $47,055.89 | $62,959.17 |
| Sep 2014 | 10,537 | $13,819.54 | $47,794.36 | $61,613.90 |
| Oct 2014 | 10,711 | $18,853.51 | $50,180.17 | $69,033.68 |
| Nov 2014 | 10,838 | $16,382.39 | $53,128.75 | $69,511.14 |
| Dec 2014 | 11,132 | $15,000.29 | $53,777.15 | $68,777.44 |

| Month/ Year | Number of VoIP Lines in Oregon | Product Sales to Oregon customers | Recurring Service Billings to Oregon customers | Total Monthly Revenue from Oregon customers |
|---|---|---|---|---|
| Jan 2015 | 11,315 | $19,267.37 | $56,151.83 | $75,419.20 |
| Feb 2015 | 11,460 | $17,053.34 | $59,321.22 | $76,374.56 |
| Mar 2015 | 11,594 | $20,641.42 | $58,856.10 | $79,497.52 |
| Apr 2015 | 11,724 | $16,012.18 | $71,122.95 | $87,135.13 |
| May 2015 | 11,852 | $14,080.24 | $87,044.32 | $101,124.56 |
| Jun 2015 | 11,991 | $15,403.98 | $81,164.60 | $96,568.58 |
| Jul 2015 | 12,163 | $17,176.91 | $79,635.00 | $96,811.91 |
| Aug 2015 | 12,343 | $18,305.51 | $80,513.53 | $98,819.04 |
| Sep 2015 | 12,528 | $20,892.92 | $90,400.07 | $111,292.99 |
| Oct 2015 | 12,709 | $14,017.99 | $95,126.27 | $109,144.26 |
| Nov 2015 | 12,872 | $13,513.81 | $93,545.67 | $107,059.48 |
| Dec 2015 | 13,068 | $14,708.71 | $98,277.45 | $112,986.16 |
| Jan 2016 | 13,231 | $17,567.61 | $102,096.87 | $119,664.48 |
| Feb 2016 | 13,342 | $14,630.08 | $101,113.77 | $115,743.85 |
| Mar 2016 | 13,467 | $14,288.32 | $97,169.72 | $111,458.04 |

Taxpayer must at least have provided adequate VoIP service to its existing customers in order to achieve that, and the court considers that ongoing service—to known, existing Oregon customers—to be a course of conduct targeting those customers.[20] By the time taxpayer has established an

---

[20] At least for the last two months at issue, taxpayer's Form 10K for the fiscal year ending January 31, 2017, eliminates any doubt that taxpayer engaged in a course of conduct targeting its existing Oregon customers. Taxpayer introduces its business model in Part I of its Form 10K as follows: "We drive the *adoption* of our platform by providing communications solutions to the large and growing markets for small business, home, and mobile users *and then accelerate growth by offering new and innovative connected services to our user base*." (Emphases added.) Later in the same public document, taxpayer specifically states: "*We sell additional services to our existing customer base by* offering free trials and promotional offers, as well as *sending email communications and leaving messages on their Ooma voicemail service*." (Emphases added.) And under the heading of "Customer Support," taxpayer notes: "In addition to providing support

ongoing, but readily terminable, service relationship with customers in Oregon, taxpayer may no longer rely on its nationwide sales and marketing efforts for immunity from tax even if, as taxpayer contends, those efforts target no one by targeting everyone.

Turning to the second step in the due process analysis, taxpayer does not seriously contest that the E911 Tax is "related to the benefit taxpayer receives from access to the state." State law plainly requires that the revenue from the E911 Tax be spent to maintain Oregon's emergency communication network. *See* ORS 403.235 - 403.245. Thus, the E911 Tax directly funds a service that taxpayer's customers may urgently need. More importantly, a federal regulation *requires* taxpayer as an "interconnected VoIP service provider" to assure its subscribers access to their local emergency communications system and imposes related obligations on taxpayer. *See* 47 CFR 9.5(b), (d), and (e). Were it not for Oregon's emergency communications system that taxpayer's payments help to fund, taxpayer would be in conflict with federal law because taxpayer would be unable to fulfill the requirement to connect its customers to a local system. The court readily concludes that the E911 Tax is rationally connected with value that Oregon's emergency network provides to taxpayer.

For the foregoing reasons, the court concludes that the department's imposition of the E911 Tax on taxpayer does not violate the Due Process Clause of the United States Constitution.

3. *Does the commerce clause prohibit the department from subjecting taxpayer to the E911 Tax?*

The court turns now to taxpayer's argument that the E911 Tax violates the Commerce Clause of the United States Constitution, which grants Congress the power "[t]o regulate Commerce * * * among the several States." US Const,

---

to our customers, we employ an *active customer management strategy* in which we *drive incremental revenue through cross-selling of products and services.*" The court finds that taxpayer, like almost any prudent service business, targeted its base of existing customers as an obvious source of potential additional profit, in addition to attending to customers' immediate need for service and support.

Art I, § 8, cl 3. Even absent congressional action, the United States Supreme Court "has long held that in some instances [the Commerce Clause] imposes limitations on the States," including on state taxing power. *Wayfair,* ___ US at ___, 138 S Ct at 2089.[21] To reconcile those limitations with the now-unquestioned rule that "interstate commerce may be made to pay its way," the Court more than 40 years ago adopted a four-part test. *See Complete Auto Transit, Inc. v. Brady*, 430 US 274, 281 & n 15, 97 S Ct 1076, 51 L Ed 2d 326 (1977). Under that test, a state tax will be sustained so long as it "applie[s] to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Id*. at 279. This case raises no issues regarding fair apportionment or discrimination against interstate commerce; only the "substantial nexus" and "fairly related" parts of the *Complete Auto* test are at issue.

### a. Substantial nexus

The Court in *Wayfair* recently reexamined the substantial nexus requirement, overruling the Court's decisions in *Quill* and *National Bellas Hess v. Illinois*, 386 US 753, 758-59, 87 S Ct 1389, 18 L Ed 2d 505 (1967) (*Bellas Hess*), which had established and maintained a requirement that

---

[21] The department notes that Congress has "specifically affirmed" the power of states to impose 9-1-1 taxes on VoIP providers. Under 47 USC section 615a-1(f)(1):

> "Nothing in this Act, the Communications Act of 1934 (47 USC 151 et seq.), the New and Emerging Technologies 911 Improvement Act of 2008, or any [Federal Communications] Commission regulation or order shall prevent the imposition and collection of a fee or charge applicable to commercial mobile services or IP-enabled voice services specifically designated by a State [or] political subdivision thereof *** for the support or implementation of 9-1-1 or enhanced 9-1-1 services, provided that the fee or charge is obligated or expended only in support of 9-1-1 and enhanced 9-1-1 services, or enhancements of such services, as specified in the provision of State or local law adopting the fee or charge."

The department states: "When Congress has expressed an intent that its own legislation and FCC regulations not be construed to prevent states from imposing charges on VoIP providers to support 9-1-1 services, one may not assume that Oregon's 9-1-1 tax is subject to a dormant Commerce Clause challenge based on *Quill*, even if *Quill* had not been overruled." At oral argument, the department acknowledged that it does not argue that this provision expressly preempts any Commerce Clause challenge to the E911 Tax.

the taxpayer have "physical presence" in the taxing state. ___ US at ___, 138 S Ct at 2096. This case requires the court to apply the substantial nexus requirement in light of *Wayfair*, taking into account the nature of the E911 Tax compared to taxes that the United States Supreme Court has considered.

The court begins by examining the substantial nexus requirement. Before *Wayfair*, the Court's opinions on the nexus requirement in state tax cases focused on the physical presence rule and its underpinnings in the context of sales and use taxes. *See, e.g., Quill*, 504 US at 298 (reaffirming *Bellas Hess*'s physical presence rule for sales and use tax obligations imposed on mail-order sellers).[22] In *Wayfair*, after rejecting the physical presence rule, the Court restated the substantial nexus requirement as follows: "'[S]uch a nexus is established when the taxpayer [or the collector of the tax] 'avails itself of the substantial privilege of carrying on business' in that jurisdiction." ___ US at ___, 138 S Ct at 2099.[23] The Court then examined the annual "quantity of business" that South Dakota required as a threshold for application of its sales tax, namely, sales exceeding $100,000, or at least 200 transactions. The Court held that these thresholds showed a "clearly sufficient" nexus. *Id.* Because each of the *Wayfair* taxpayers had agreed that it exceeded these thresholds, the Court determined that the nexus between the taxpayers' activity and South Dakota was established based on the taxpayers' "economic and

---

[22] The Court in other cases has easily found substantial nexus based on facts indicating that the taxpayer maintained a physical presence in the taxing state. *Cf., e.g., National Geographic v. Cal. Equalization Bd.*, 430 US 551, 559, 97 S Ct 1386, 51 L Ed 2d 631 (1977) (taxpayer's maintenance of office in taxing state sufficient for nexus); *D.H. Holmes Co. v. McNamara*, 486 US 24, 32-33, 108 S Ct 1619, 100 L Ed 2d 21 (1988) (nexus met where taxpayer distributed catalogs, maintained multiple stores in taxing state and earned over $100 million from sales in that state); *Commonwealth Edison Co. v. Montana*, 453 US 609, 617, 101 S Ct 2946, 69 L Ed 2d 884 (1981) (Montana tax on severance of coal in Montana satisfied substantial nexus requirement); *see also Capital One Auto Finance, Inc. v. Dept. of Rev.*, 22 OTR 326, 343 (2016) (noting that there is "no clear Supreme Court precedent with respect to income or excise taxes that requires a physical presence for such taxes), *aff'd on other grounds*, 363 Or 441, 423 P3d 80 (2018).

[23] The Court here quoted *Polar Tankers, Inc. v. City of Valdez*, 557 US 1, 11, 129 S Ct 2277, 174 L Ed 2d 1 (2009), a property tax case involving the Tonnage Clause, but the "avails itself" phrase is also used in the Due Process Clause analysis in state income tax cases. *E.g., Mobil Oil Corp. v. Commissioner of Taxes*, 445 US 425, 437, 100 S Ct 1223, 63 L Ed 2d 510 (1980).

virtual contacts."[24] *Id.* Although the Court then raised the possibility that "some other principle in the Court's Commerce Clause doctrine might invalidate" the South Dakota act, the Court discussed no further principles or facts involving the concept of substantial nexus. *Id.*[25]

As recounted above, taxpayer's "quantity of business" in Oregon, based on taxpayer's sales revenue, greatly exceeds the minimum sales revenue under South Dakota law that the Court approved in *Wayfair.* Taxpayer had more than $600,000 in annual revenue from Oregon customers in the first 12 months at issue, and that amount grew to more than $1 million for the last 12 months at issue. Based on a straightforward application of *Wayfair*, then, taxpayer's activities obviously have a substantial nexus with Oregon.

Taxpayer argues that, notwithstanding *Wayfair*, this court should apply a physical presence requirement in this case. Taxpayer first seeks to distinguish *Wayfair* on the grounds that the E911 Tax, together with other states' "indirect"[26] taxes, impose administrative and compliance burdens so "crushing" that the Commerce Clause forbids laying them on companies that lack a physical presence in the taxing state. Taxpayer points out that the E911 Tax has

---

[24] The Court stated that the taxpayers, as "large, national companies," "undoubtedly maintain an extensive virtual presence." *Id.* However, the Court discussed no specific factual findings on this point, the case having proceeded on a spare factual record after the state conceded summary judgment in the trial court based on the application of *Quill. See id.* at 2089. In this case, the court finds the factual record of taxpayer's economic presence in Oregon adequate to decide the case without considering the extent, if any, of taxpayer's virtual presence.

[25] The Court did mention three features of the South Dakota act that the Court described as "designed to prevent discrimination against or undue burdens upon interstate commerce." *Id.* at 2099. Those features do not appear to relate to the substantial nexus part of the *Complete Auto Transit* test, however, and two of the features (safe harbor thresholds and anti-retroactivity provisions) do not appear to be relevant here. The court discusses below the *Wayfair* Court's observations about the third feature, states' efforts to streamline and standardize local sales and use taxes.

[26] Taxpayer does not define the term "indirect taxes." The court understands taxpayer to be referring to sales taxes and other charges that taxpayer is allowed or required to collect from its customers. *See Black's Law Dictionary*, (11th ed 2019) (defining "indirect tax" as "1. A tax on a right or privilege, such as an occupation tax or franchise tax. • An indirect tax is often presumed to be partly or wholly passed on from the nominal taxpayer to another person. 2. A tax that is added to the cost of goods or services.").

some of the burdensome features of the sales and use taxes involved in *Bellas Hess*, *Quill*, and *Wayfair*, namely, the requirement to collect and remit tax from customers and to determine the amount of liability immediately when making sales to customers. *Cf. Capital One*, 22 OTR at 343 (describing typical sales tax collection burdens). *Wayfair*, however, declared these burdens, by themselves, insufficient to justify a physical presence requirement. *See* ___ US at ___, 138 S Ct at 2093 (referring to seller's collection duty as a "familiar and sanctioned device"). But taxpayer asks the court to consider these burdens in the greater context of all indirect taxes imposed on telecommunications services nationwide, which taxpayer claims are far more numerous and varied, and require vastly greater numbers of returns, than is the case for general, nontelecommunications businesses.

The court struggles with taxpayer's evidence, which consists of a 2004 study addressing the telecommunications industry as a whole, including traditional wireline service providers and wireless service providers. The study nowhere mentions the then-nascent VoIP industry. Although the study supports taxpayer's factual position that telecommunications providers at that time were subject to a much greater number and variety of taxes and filing obligations than imposed on other businesses, the study attributes this inequity to "outmoded statutes that originated during the era when telecommunications companies were closely regulated monopolies." Taxpayer provides no evidence that these "outmoded" statutes actually applied to the relatively new VoIP industry.[27] The same study also reports that the number of filings required had *decreased* by about 28 percent over the five years preceding the study, due largely to efforts by five states to simplify their telecommunications tax structures. (Required filings dropped from 66,918 to 47,921 from 1999 to 2004.) If that reduction were trended to the present (16 years later), it might be reasonable to suppose that the problem taxpayer complains of has been solved—there is no evidence either way. Finally, a 2017 study that the parties introduced as a stipulated exhibit suggests that, to the extent a problem persists, emergency access charges

---

[27] Recall that the Oregon legislature in 2014 felt the need to update the E911 Tax to include VoIP providers. Or Laws 2014, ch 59, § 3a.

are not likely a significant cause: "Most wireless 911 fees are levied at uniform rates statewide, although there are a few exceptions." From these materials the court cannot discern anything approaching the "virtual welter of complicated obligations to local jurisdictions" that moved the Court in *Bellas Hess* to first declare a physical presence requirement for sales and use taxes. *See* 386 US at 759-60.[28]

Taxpayer's resort to the 2004 study also undermines its next argument. Taxpayer asserts that a physical presence requirement for the E911 Tax would not distort the market in which taxpayer operates, in contrast to the market distortion that the Court found in *Wayfair*. The Court in *Wayfair* took pains to illustrate how a physical presence requirement for sales and use taxes could create market distortion by driving business away from a hypothetical company that placed its warehouse in the taxing state, and by driving business into the arms of an otherwise identical company that kept its warehouse a few miles across the state line, safe from any requirement to collect sales or use tax. *See* ___ US at ___, 138 S Ct at 2085. Taxpayer argues that the Court's distortion scenario does not apply in this case because VoIP providers do not need a substantial physical plant in any state (ignoring, for the sake of argument, any office or headquarter facility). For purposes of its "no distortion" argument, taxpayer thus posits a comparison solely among competitors *within* the VoIP industry; yet for purposes of its earlier "crushing burden" argument, taxpayer implicitly characterizes wireline and wireless providers as among its competitors by relying on the 2004 study. The Oregon statutes make it clear that any "distortion" analysis must take non-VoIP providers into account. The Oregon

---

[28] Even if taxpayer could show that other states unduly burden its business, the court is not persuaded that the substantial nexus requirement, as articulated in *Wayfair*, requires this court to strike down this state's statute. As discussed below, in concluding that substantial nexus was present, the Court described with approval South Dakota's adoption of the Streamlined Sales and Use Tax Agreement, which, among other things, requires each state to adopt a single, centralized administrative system statewide and to ensure that the tax base of all localities is identical to the tax base of the tax that the state itself imposes. *See Wayfair*, ___ US at ___, 138 S Ct at 2099-2100. Oregon goes providers one better, imposing the E911 Tax solely at the state level. The E911 Tax also is inherently straightforward, applying on a monthly basis, which enables taxpayer to build it into its recurring billings, and it is modest in amount at 75 cents per "line," a unit that taxpayer understands.

collection obligation applies to any "provider" of access to the emergency communications system, which by definition includes a "telecommunications utility" that "owns, operates, manages or controls all or a part of any plant or equipment in this state." ORS 759.005(9)(a)(A) (defining "telecommunications utility"); *see* ORS 403.215; ORS 403.105(19); ORS 403.105(27). The court concludes that taxpayer misapplies the market distortion analysis by positing a class that is artificially limited to VoIP providers, thus excluding other providers that have obvious and extensive physical presence in the state and that taxpayer's own proffered study indicates are its competitors. Therefore, even if the court were persuaded that taxpayer is exposed to a large number of local tax regimes, the court, following *Wayfair*, would not adopt a physical presence requirement lest the court distort the market in favor of taxpayer and to the detriment of utilities and other competitors with physical presence in Oregon.

Taxpayer urges the court to conclude that its activities lack substantial nexus with Oregon because its advertising does not target the Oregon market. Taxpayer claims: "It is clear from the Court's holding in *Wayfair* that 'substantial nexus' existed because the online retailers used 'targeted advertising' that provided 'instant access to most consumers via any internet-enabled device.'" (Quoting ___ US at ___, 138 S Ct at 2095.) This court cannot find such a holding in *Wayfair*. The quoted language appears in the Court's discussion of the artificiality of the physical presence rule in general. Nowhere does the Court "hold" that the taxpayers in that case used advertising targeted at South Dakota, nor does the Court cite any finding of fact to that effect. As noted above, the limited factual record in *Wayfair* established only that "[e]ach [taxpayer] easily meets the minimum *sales or transactions* requirement of the Act." ___ US at ___, 138 S Ct at 2089 (emphasis added). The Court discussed ways in which online retailers generally may maintain a "virtual presence" in a state, but "targeted advertising" was only one of the methods the Court listed for doing so. Others included maintaining a "virtual showroom" and making the company's advertising available "via any internet-enabled device." *Id.* at ___, 138 S Ct at 2095. Taxpayer's claim that the Court found substantial nexus "because" of targeted advertising

by the taxpayers in that case is inaccurate, and taxpayer's attempt to build on that incorrect claim to construct an argument premised on taxpayer's *lack* of Oregon-targeted advertising fails.

Finally, taxpayer argues that it and the entire VoIP industry have "settled expectations" of a physical presence requirement, which this court should now fulfill. The court sees nothing in *Quill* that sets any reasonable expectation that a physical presence requirement would apply to Oregon's E911 Tax. *Quill* was not a unanimous decision, and even the majority cautioned that "contemporary Commerce Clause jurisprudence might not dictate the same result were the issue to arise for the first time today." 504 US at 311. Taxpayer is compelled to distinguish the E911 Tax from the kind of sales or use tax at issue in *Quill* and *Bellas Hess* (because *Wayfair* overruled those opinions), yet taxpayer also points to no instance in which the Court extended the physical presence requirement of *Quill* and *Bellas Hess* to any other kind of tax. Taxpayer has no good reason to expect that a physical presence rule would apply to it.

> b.   Is the E911 Tax sufficiently related to the services Oregon provides?

Taxpayer next attacks the E911 Tax on the ground that it is insufficiently related to the services Oregon provides. Taxpayer offers two alternative tests by which to measure the degree of relationship: the test stated in *Complete Auto Transit*, and a more demanding test that the United States Supreme Court has applied to charges for the use of state-provided facilities, both in *Airport Authority v. Delta Airlines*, 405 US 707, 92 S Ct 1349, 31 L Ed 2d 620 (1972) (*Evansville-Vandenburgh*) and in *Commonwealth Edison Co. v. Montana*, 453 US 609, 101 S Ct 2946, 69 L Ed 2d 884 (1981). This court concludes that the E911 Tax satisfies either test. Therefore, the court does not wade into the murky waters of distinguishing between a "general revenue tax" covered by *Complete Auto Transit* and a "user fee" covered by *Evansville-Vandenburgh*.[29]

---

[29] *See American Trucking Assns. v. State of Oregon*, 339 Or 554, 562-67, 124 P3d 1210 (2005) (considering both lines of cases in determining constitutionality

The *Complete Auto Transit* test asks whether the "tax
\*\*\* is fairly related to the services provided by the State."
430 US at 279. The Court stated the test more specifically in
*Commonwealth Edison* as whether "the *measure* of the tax [is]
reasonably related to the extent of the contact, since it is the
activities or presence of the taxpayer in the State that may
properly be made to bear a 'just share of State tax burden.'"
453 US at 626 (emphasis in original; citations omitted). In
that case, the tax was a severance tax imposed on the mining
of coal in Montana, and it was measured as a percentage of
the contract sales price for the coal. The Court easily con-
cluded that the percentage-of-value measure was in proper
proportion to the taxpayer's activities within the state and
caused the taxpayer to "shoulder[] its fair share of supporting
the State's provision of police and fire protection, the benefit
of a trained work force, and the advantages of a civilized soci-
ety." *Id.* at 626 (internal quotation marks omitted).

Here, the "measure" of the E911 Tax is per month
and per "line." *See* ORS 403.200(1). The parties agree that
taxpayer had a certain number of "telephone lines to Oregon
customers" at any given time, and that that number grew
from 6,633 in January 2013 to 13,467 in March 2016.[30] As
discussed above, taxpayer's monthly revenue from Oregon
customers grew at a faster rate than its number of lines,
but both grew substantially: The number of lines grew by

---

of per-mile charges; applying *Complete Auto Transit*). Distinctions between
taxes and fees arise under various provisions of Oregon law as well. *See, e.g.*,
*AAA Oregon/Idaho Auto Source v. Dept. of Rev.*, 363 Or 411, 424, 423 P3d 71
(2018) (holding, in part, that voters intended Article IX, section 3a, of the Oregon
Constitution to apply only to "special highway user taxes" and not to all taxes
imposed on a status or activity involving motor vehicles); *Sproul v. State Tax
Com.*, 234 Or 579, 581, 383 P2d 754 (1963) (statute levying an assessment to
fund forest fire prevention held to be an exercise of the state's police power
and not an exercise of the state's taxing power); *PacifiCorp v. Dept. of Energy*,
21 OTR 116, 117-18 (2013) (citing *Multnomah County v. Talbot*, 56 Or App 235,
641 P2d 617 (1982) (tax court lacked subject matter jurisdiction to consider
whether a charge imposed on certain energy resource suppliers under ORS
469.421(8) was a fee or a tax, and whether that charge violated the Oregon
Constitution)).

[30] In response to a request by the court for clarification, the parties appear
to acknowledge that the statutory references to a "line" are imprecise and poten-
tially outdated when applied to VoIP providers. The court accepts for purposes of
this case the parties' apparent operating assumption that the number of lines is
tied to the number of Oregon-resident customers, admitting the possibility that a
single customer might choose to subscribe to more than one "line."

203 percent, while the monthly revenue grew by 290 percent. The graph below shows the change in the number of lines, monthly revenue from services, and total revenue, over the course of the periods at issue. The graph illustrates that taxpayer's number of lines for Oregon customers grew steadily, while gross revenues from Oregon fluctuated moderately but also grew overall.



Considering as a baseline those taxes measured as a percentage of sales or revenue, the court finds that the per-line measure of the E911 Tax, too, is a reasonable measure of the extent of taxpayer's contact with Oregon. In taxpayer's business, having subscribed lines is a prerequisite to deriving service revenue from Oregon customers. Although taxpayer obviously has managed to grow revenue faster than it adds new lines, apparently in part by contacting existing customers to sell more services per line, the court finds a strong connection between the number of lines and revenue amounts. If anything, at least in taxpayer's case, the charge per line is a conservative measure of taxpayer's activity in Oregon. The court concludes that the "fairly related" requirement under *Complete Auto Transit* is satisfied.[31]

---

[31] Taxpayer also argues that under the "fairly related" requirement the state must confer benefits that specifically help maintain the economic market for the taxpayer's revenue-producing activity. That is incorrect:

The court now turns to the test stated in *Evansville-Vandenburgh*. The Supreme Court considered two states' "enplaning" charges: flat fees of $1 or less imposed each time a passenger boarded an airplane for a commercial flight. The funds were dedicated to various purposes related to aeronautics or airport maintenance. The Court started its analysis by noting:

> "We therefore regard it as settled that a charge designed only to make the user of state-provided facilities pay a reasonable fee to help defray the costs of their construction and maintenance may constitutionally be imposed on interstate and domestic users alike."

405 US at 714. The Court then considered the analogous subject of tolls, summarizing the test under its extensive case law as follows:

> "At least so long as the toll is based on some fair approximation of use or privilege for use, as was that before us in *Capitol Greyhound*, and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred, it will pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users."

*Id*. at 716-17. The Court applied this test to the enplaning fees, easily concluding that the fees did not discriminate against interstate commerce because the same fee applied both to intrastate flights and to flights to destinations outside the state of enplanement.

The Court next found that the fees "reflect[ed] a fair, if imperfect, approximation of the use of facilities for whose

---

"On the contrary, interstate commerce may be required to contribute to the cost of providing *all* governmental services, including those services from which it arguably receives no direct benefit. The fourth prong of the Complete Auto test thus focuses on the wide range of benefits provided to the taxpayer, not just the precise activity connected to the interstate activity at issue.

"* * * * *

"* * * The benefits that Illinois provides cannot be limited to those exact services provided to the equipment used during each interstate telephone call. Illinois telephone consumers also subscribe to telephone service in Illinois, own or rent telephone equipment at an Illinois service address, and receive police and fire protection as well as the other general services provided by the State of Illinois."

*Goldberg v. Sweet*, 488 US 252, 267, 109 S Ct 582, 102 L Ed 607 (1989) (internal quotation marks omitted; citations omitted; emphasis in original).

benefit they are imposed." *Id*. at 717. The Court based that finding on a review of the classes of fees and the transactions to which they applied. That analysis revealed that no fee was charged on the majority of enplanings due to numerous exemptions. However, the Court concluded that this discrepancy did not invalidate the fee because the exemptions and other classifications reflected "rational distinctions." *Id*. at 718.

Finally, the Court found that the fee revenue was not excessive in relation to the costs the taxing authorities incurred. In the Indiana case, the annual fees at issue, plus other earmarked revenue, added up to less than the annual debt service cost for capital improvements at the airport. In the New Hampshire case, the airline plaintiffs protested that 50 percent of the fee revenue went to local governments that owned the landing areas, without any requirement that the funds be spent on airport-related costs. However, the Court found that the airlines had not shown that the revenues for local governments exceeded the local governments' airport costs; therefore, the Court concluded that the lack of a restriction on the funds the localities received did not make the fees excessive. *Id*. at 720. The Court also noted that imposition of the fees did not seem to conflict with federal air transportation policies.

Applying the test in *Evansville-Vandenburgh*, the court now finds as follows with respect to the first and second criteria: First, the E911 Tax is nondiscriminatory for the same reason as in *Evansville-Vandenburgh*: each line is associated with an *Oregon* customer, and the same flat 75-cent monthly charge applies to every line, regardless of whether the customer uses the line for in-state calling or calling out of state, and regardless of where the provider is located. Second, the per-line charge is a fair approximation of use of the emergency communications system because the point of such a system is to facilitate *access* to emergency services at all times. A phone line is a prerequisite to that access; therefore, a charge that is levied periodically (monthly) on that access is a reasonable way to assign the burden among persons that receive the benefit of constant access. The E911 Tax also is subject to certain exemptions, *see, e.g.*, ORS 403.205, but taxpayer does not assert that these, or any classifications in the statute, are irrational.

Regarding the third criterion in *Evansville-Vandenburgh*, taxpayer asserts that the E911 Tax is excessive, but not due to appropriation of funds for unrelated purposes as the airlines alleged in that case. In fact, taxpayer acknowledges: "Amounts collected as E911 Taxes are not to be used to fund any other aspect of the Oregon government." Rather, taxpayer insists that the E911 Tax is excessive because there is no evidence "that OOMA has received anything of value from the state." The court rejects this argument. Taken to its logical end, taxpayer's statement would imply a belief that the existence of an emergency 9-1-1 communications system does not benefit taxpayer, even though the system quite literally helps to keep taxpayer's customers alive and safe. Rather than ascribe such a view to this or any reputable business, the court views the statement as hyperbole. It is particularly overblown in this case because all evidence is to the contrary. As discussed above, taxpayer obviously is keenly interested in maintaining long-term relationships with its customers, not merely to preserve existing revenue streams but also because each customer is a potential source of additional, new business in the form of additional services from taxpayer. To the extent the point requires any further reasoning, the court finds that Oregon's emergency communications system also benefits taxpayer directly. If the system did not exist, taxpayer could not comply with the requirement under federal law to provide access to a local system. *See* 47 CFR § 9.5 This is true even though, as taxpayer argues, federal law also imposes an independent obligation on each *state* to provide an emergency communications system. The existence of complementary obligations does not take away taxpayer's own obligation. The court concludes that the E911 Tax is not excessive in comparison with the governmental benefit that Oregon confers on taxpayer.

### 4.  *Penalties*

The department assessed failure-to-file penalties against taxpayer pursuant to ORS 314.400(1), (3)(a), (3)(b), and ORS 305.992. Taxpayer argues that it has taken a reasonable position in asserting that its activities were not subject to the E911 Tax and urges the court to reject taxpayer's imposition of penalties.

The court has jurisdiction to determine whether the department has correctly applied statutes imposing penalties.[32] ORS 314.400(3)(a)-(b) provides:

> "In the case of a report or return that is required to be filed more frequently than annually and the failure to file the report or return continues for a period in excess of one month after the due date:
>
> "(a)   There shall be added to the amount of tax required to be shown on the report or return a failure to file penalty of 20 percent of the amount of the tax; and
>
> "(b)   Thereafter the Department may send a notice and demand to the person to file a report or return within 30 days of the mailing of the notice. If after the notice and demand no report or return is filed within the 30 days, the Department may determine the tax according to the best of its information and belief, assess the tax with appropriate penalty and interest plus an additional penalty of 25 percent of the tax deficiency determined by the Department and give written notice of the determination and assessment to the person required to make the filing."

Taxpayer is responsible for collecting the E911 Tax and filing quarterly returns with the department. ORS 403.215(1). Taxpayer stipulated that it did not file emergency communication tax returns with the department during the periods at issue. ORS 314.400 does not permit the court to take into consideration the reasonableness of the legal argument offered by taxpayer in order to reduce the amount of the penalties. *Cf.* ORS 314.402(4)(b)(A)-(B) (reducing "substantial underpayment" penalty if underpayment was based on "substantial authority," or had "reasonable basis" and was "adequately disclosed"). The court concludes taxpayer is subject to the penalty under ORS 314.400(3)(a)-(b).

---

[32] Taxpayer has not alleged that it has requested a waiver of penalties from the department, nor does taxpayer ask the court to review any denial of such a request. *See Pelett v. Dept. of Rev.*, 11 OTR 364, 365-66 (1990) (holding that, under ORS 305.560(1), the court has the authority to review *de novo* whether a penalty applies, but not whether defendant should have waived the penalty); *Pinski v. Dept. of Rev.*, 14 OTR 376, 379 (1998) (the question whether the department should have waived the 100 percent penalty that was assessed pursuant to ORS 305.992 is "not a question within the jurisdiction of the court").

The department also assessed penalties for each tax period at issue as provided in ORS 305.992, which states:

"(1)   If any returns required to be filed under *** ORS chapter *** 314 *** are not filed for three consecutive years by the due date (including extensions) of the return required for the third consecutive year, there shall be a penalty for each year of 100 percent of the tax liability determined after credits and prepayments for each such year.

"(2)   The penalty imposed under this section is in addition to any other penalty imposed by law. However, the total amount of penalties imposed for any taxable year under this section *** 314.400 *** may not exceed 100 percent of the tax liability."

As with the penalty under ORS 314.400, nothing in ORS 305.992 reduces the penalty based on the character of the taxpayer's position. Here there is no dispute that taxpayer did not file quarterly returns for the periods at issue. The court concludes that taxpayer is subject to the penalty under ORS 305.992 for each period at issue in this case. *See, e.g.*, *Ashby v. Dept. of Rev.*, 21 OTR 47, 55 (2012) (holding that taxpayer is subject to penalty of ORS 305.992 when there is no dispute that taxpayer failed to file returns for the tax years at issue in that case).

## V.   CONCLUSION

The court concludes that taxpayer is subject to the reporting and remitting requirements of the E911 Tax imposed by ORS 403.200(1). The imposition of the E911 Tax on taxpayer does not violate the federal Due Process Clause because taxpayer has sufficient minimum connections with Oregon. The imposition of the E911 Tax is permissible under the Commerce Clause because there is substantial nexus between Oregon and taxpayer, and because the measure of the E911 Tax is fairly related to taxpayer's activities in Oregon and is not excessive. Taxpayer is subject to penalties pursuant to ORS 314.400 and ORS 305.992. Now, therefore,

IT IS ORDERED that Plaintiff's motion for summary judgment is denied; and

IT IS FURTHER ORDERED that the Defendant's cross-motion for summary judgment is granted.