DUNCAN, J.
*73 **413 In 2017, the legislature enacted a law that provides, in part, "A tax is imposed on each vehicle dealer for the privilege of engaging in the business of selling taxable motor vehicles at retail in this state." Or. Laws 2017, ch. 750, § 90(1). The issue in this case is whether that tax is subject to Article IX, section 3a, of the Oregon Constitution. As relevant here, Article IX, section 3a, provides that taxes "on the ownership, operation or use of motor vehicles" "shall be used exclusively for the construction, reconstruction, improvement, repair, maintenance, operation and use of public highways, roads, streets and roadside rest areas in this state." For the reasons explained below, we conclude the tax is not subject to Article IX, section 3a.
I. PROCEDURAL BACKGROUND
This case is before this court because, in the same law that established the tax at issue, the legislature conferred original jurisdiction upon this court to determine whether the tax is subject to Article IX, section 3a. Or. Laws 2017, ch. 750, § 112(3)(a). The law also authorized "[a]ny person interested in or affected or aggrieved by" the tax to petition this court to make that determination. Or. Laws 2017, ch. 750, § 112(2). Pursuant to that authority, petitioners-AAA Oregon/Idaho Auto Source, LLC (Auto Source), AAA Oregon/Idaho, and Oregon Trucking Associations, Inc.-filed the petition for judicial review in this case. The state appears as respondent, and the Oregon Legislative Assembly appears as amicus curiae .
Petitioners assert that they have standing for several reasons, including that Auto Source is a vehicle dealer who is subject to the tax. Respondent agrees that Auto Source is affected by the tax. Therefore, it is undisputed that Auto Source has standing. Accordingly, we proceed to our review of the tax. See MacPherson v. DAS , 340 Or. 117, 123-24, 130 P.3d 308 (2006) (in a case with multiple plaintiffs, only one needs to establish standing).
II. DISCUSSION
We begin with a description of the tax at issue, before turning to an examination of Article IX, section 3a, **414 and then addressing whether the tax is subject to Article IX, section 3a.
A. The Tax
The tax at issue was imposed by the legislature through Oregon Laws 2017, chapter 750, section 90, and we refer to it as the "Section 90" tax. By its terms, the Section 90 tax is a "privilege tax," and it is imposed on vehicle dealers "for the privilege of engaging in the business of selling taxable motor vehicles at retail in this state."[1] Id. § 90(1). It is "computed at the rate of 0.5 percent of the retail sales price of the taxable motor vehicle." Id. § 90(2). It is to be paid by vehicle dealers by means of quarterly tax returns filed with the Department of Revenue. Id. § 98(2), (4). "A vehicle dealer may collect the amount of the privilege tax computed on the retail sales price of a taxable motor vehicle from the purchaser of the taxable motor vehicle." Id. § 90(3)(a).
As noted, the Section 90 tax is imposed on "vehicle dealers" and is based on retail sales of "taxable motor vehicles." A "vehicle dealer" is "[a] person engaged in business in this state that has been issued a vehicle dealer certificate under ORS 822.020." Or. Laws 2017, ch. 750, § 89(9)(a). A "taxable motor *74 vehicle" is "a new motor vehicle with a gross vehicle weight rating of 26,000 pounds or less" that is also, inter alia , a "vehicle as defined in ORS 744.850, other than an all-terrain vehicle" or a "commercial vehicle as defined in ORS 801.210."[2] Id. § 89(6). Thus, the Section 90 tax is **415 imposed only on vehicle dealers, and, it is calculated based only on certain sales. It is not triggered by all motor vehicle sales; specifically, it is not triggered by sales by persons who are not vehicle dealers, by sales to resellers, or by sales of used vehicles.
The legislature did not view the Section 90 tax as a tax on the "ownership, operation or use of motor vehicles" for the purposes of Article IX, section 3a. Or. Laws 2017, ch. 750, § 112(1) ("It is the intent of the Legislative Assembly that revenue from the privilege tax imposed under section 90 of this 2017 Act is not subject to the provisions of Article IX, section 3a, of the Oregon Constitution."). In keeping with that view, the legislature provided that moneys received from the Section 90 tax shall be deposited into the Zero-Emission Incentive Fund and the Connect Oregon Fund, rather than the State Highway Fund (or other fund dedicated to the uses listed in Article IX, section 3a ).[3]
In addition to the Section 90 tax, which it refers to as a "privilege tax," Oregon Laws 2017, chapter 750, also establishes what it refers to as a "use tax." Specifically, **416 section 91 of the law imposes a tax "on the storage, use or other consumption in this state of taxable motor vehicles purchased at retail from any seller," and we refer to that tax as the "Section 91" tax. Id. § 91(1). The rate of the Section 91 use tax is the same as the rate of the Section 90 privilege tax: "0.5 percent of the retail sales price of the taxable motor vehicle." Id. § 91(2). The Section 91 use tax is a liability of the purchaser, but it is reduced by the amount of other taxes imposed upon the sale, including any privilege tax. Id. § 91(3), (4). Thus, if a dealer pays the Section 90 privilege tax (either on its own or after collecting the tax from the purchaser), the purchaser will not have to pay the Section 91 use tax. Because the amounts of the two taxes are the same, payment of the Section 90 privilege tax reduces the Section 91 use tax to zero.[4] The legislature provided that moneys from the Section 91 use tax shall be deposited into the State Highway Fund. Id. § 96(2)(b).
As mentioned, the legislature conferred original jurisdiction upon this court to determine whether the Section 90 privilege tax is *75 subject to Article IX, section 3a. Or. Laws 2017, ch. 750, § 112(2). It also provided that, if this court determines that the Section 90 privilege tax is subject to Article IX, section 3a, then both Section 90 and Section 91 are repealed. Id. § 112(8).
B. Article IX, Section 3a
Having described the Section 90 tax, we turn to Article IX, section 3a, to determine its scope and whether the Section 90 tax falls within it. Article IX, section 3a, restricts the uses of certain taxes. In pertinent part, it provides:
"(1) Except as provided in subsection (2) of this section, revenue from the following shall be used exclusively for the construction, reconstruction, improvement, repair, maintenance, operation and use of public highways, roads, streets and roadside rest areas in this state:
"(a) Any tax levied on, with respect to, or measured by the storage, withdrawal, use, sale, distribution, importation **417 or receipt of motor vehicle fuel or any other product used for the propulsion of motor vehicles; and
"(b) Any tax or excise levied on the ownership, operation or use of motor vehicles."
Thus, Article IX, section 3a, restricts the use of two categories of taxes: certain "motor vehicle fuel" taxes, which are the subject of paragraph (1)(a), and certain "motor vehicle" taxes, which are the subject of paragraph (1)(b).
Article IX, section 3a, was adopted by the voters in 1980, based on a legislative referral. 79 Senate Joint Resolution (SJR) 7 (1979) (adopted May 20, 1980). But the relevant text of the provision, quoted above, has been in the Oregon Constitution since 1942, when it was adopted as part of former Article IX, section 3, which was also the result of a legislative referral to the voters. 41 SJR 11 (1941) (adopted Nov. 3, 1942). The descriptions of the categories have remained the same since 1942.[5]
The 1942 provision was repealed and replaced by the 1980 provision to further limit the permissible uses of the two categories of taxes. The only substantive difference between the two provisions is that the 1942 provision allowed for use of the taxes to support "policing" of public highways, roads, and streets, as well as acquiring and maintaining "parks, recreational, scenic or other historic places," and the 1980 provision deleted those uses. 79 SJR 7 (1979); Official Voters' Pamphlet, Primary Election, May 20, 1980, 4.[6]
Because the relevant text of Article IX, section 3a, was adopted in 1942 and has remained the same since then, when interpreting the phrase at issue, our task is to determine the intent of the voters in 1942. See generally Parrish v. Rosenblum , 362 Or. 96, 111, 403 P.3d 786 (2017) (citing State v. McGinnis , 56 Or. 163, 165, 108 P. 132 (1910), for proposition that restated text in an amendatory act is considered part of **418 the original statute, whereas only the changes to the original are regarded as a new enactment); State ex rel Caleb v. Beesley , 326 Or. 83, 88, 949 P.2d 724 (1997) (to similar effect, citing other cases).
We interpret a referred constitutional amendment "within the same basic framework as we interpret statutes: by looking to the text, context, and legislative history of the amendment to determine the intent of the voters." State v. Sagdal , 356 Or. 639, 642, 343 P.3d 226 (2015) ; Couey v. Atkins , 357 Or. 460, 490-91, 355 P.3d 866 (2015) (the goal is to discern "the meaning of the provision at issue most likely understood by those who adopted it"). We look first to the text of the provision, which is "[t]he best evidence of the voters' intent."
*76 Sagdal , 356 Or. at 642, 343 P.3d 226 (quoting State v. Harrell/Wilson , 353 Or. 247, 255, 297 P.3d 461 (2013) ); Northwest Natural Gas Co. v. Frank , 293 Or. 374, 381, 648 P.2d 1284 (1982) ("[I]n a case of statutory and constitutional construction, this court must give preeminent attention to the language which the legislature and the people have adopted."). When examining the text, we apply rules of construction that bear directly on the provision's interpretation. Harrell/Wilson , 353 Or. at 257, 297 P.3d 461. Those rules include the rule, set out in ORS 174.010, that courts are "not to insert what has been omitted, or to omit what has been inserted." PGE v. Bureau of Labor and Industries , 317 Or. 606, 611, 859 P.2d 1143 (1993) (so stating). We consider the provision's text in context, and the context includes preexisting constitutional provisions, statutes, and case law. Sagdal , 356 Or. at 642, 343 P.3d 226. In addition, we consider the provision's history, to the extent that it appears useful to our analysis. Id . at 642-43, 343 P.3d 226. The history "includes 'sources of information that were available to the voters at the time the measure was adopted and that disclose the public's understanding of the measure,' such as the ballot title, arguments included in the voters' pamphlet, and contemporaneous news reports and editorials." Id . (quoting Ecumenical Ministries v. Oregon State Lottery Comm. , 318 Or. 551, 559 n. 8, 871 P.2d 106 (1994) ).
1. Text of Article IX, Section 3a
Applying that interpretative methodology, we look first to the text of Article IX, section 3a. Again, **419 Article IX, section 3a, limits the uses of two categories of taxes, set out in paragraph (1)(a) and paragraph (1)(b):
"(a) Any tax levied on, with respect to, or measured by the storage, withdrawal, use, sale, distribution, importation or receipt of motor vehicle fuel or any other product used for the propulsion of motor vehicles; and
"(b) Any tax or excise levied on the ownership, operation or use of motor vehicles."
Petitioners argue that the Section 90 tax falls within paragraph (1)(b) because it is a tax "on the ownership *** of motor vehicles." Specifically, petitioners contend that taxes "on the ownership *** of motor vehicles" include taxes levied on the exercise of any of the rights of ownership, including the rights to sell and use. Petitioners posit that the voters would have understood "the concept of ownership" to include "multiple segregable rights or incidents, principal among which were the rights to sell and to use," and, therefore, it is likely that the voters would have understood taxes levied "on the ownership *** of motor vehicles" to include taxes levied on the sale or use of motor vehicles.
Contrary to petitioner's argument, the text of Article IX, section 3a, does not indicate that the taxes "on the ownership *** of motor vehicles" include taxes levied on, or measured by, sales of motor vehicles. Instead, for two reasons, the text indicates that taxes "on the ownership *** of motor vehicles" are limited to taxes levied on the status of ownership, and do not include taxes levied on actions-like a sale-that an owner may take.
First, the text of Article IX, section 3a, shows that the drafters identified the subject taxes by describing the specific action or status on which the tax is levied, and that they referred separately to taxes levied on use, sales, and ownership. Paragraph (1)(a) lists taxes relating to several actions involving motor vehicle fuels, specifically, "the storage, withdrawal, use, sale, distribution, importation or receipt" of such fuels. Of particular relevance to this case, paragraph (1)(a) includes taxes levied on, or measured by, the "sale" of motor vehicle fuels, as well as the "use" of tax fuels. In contrast to paragraph (1)(a), paragraph (1)(b)
**420 applies only to taxes "on the ownership, operation, and use" of motor vehicles. Thus, of the several actions listed in paragraph (1)(a), the only one included in paragraph (1)(b) is "use." Paragraph (1)(b) does not refer to taxes on sales, even though paragraph (1)(a) does.
The fact that paragraph (1)(a) of Article IX, section 3a, refers to taxes levied on sales, but paragraph (1)(b) does not, indicates that paragraph (1)(b) does not include taxes levied on sales. See generally *77 Springfield Utility Board v. Emerald PUD , 339 Or. 631, 642, 125 P.3d 740 (2005) (generally, when a term is used in one provision and excluded from another, courts assume that exclusion was purposeful and meant to indicate a distinction between the two provisions); Perlenfein and Perlenfein , 316 Or. 16, 22, 848 P.2d 604 (1993) (when a legislature or agency uses a particular term in one provision of a statute or regulation, but omits that same term in a parallel and related provision, this court infers that the enacting or promulgating body did not intend that the term apply in the provision from which the term is omitted); see also King Estate Winery, Inc. v. Dept. of Rev. , 329 Or. 414, 422, 988 P.2d 369 (1999) (in statute exempting certain categories of farm machinery from ad valorem taxation, the legislature's reference to machines for processing and selling farm products in the subsection relating to animal farming, but not in the subsection relating to crop farming, indicated that the legislature did not intend to exempt machines for processing and selling crops); Hughes v. State of Oregon , 314 Or. 1, 28, 838 P.2d 1018 (1992) (statute that referred to past and present retirement benefits did not apply to future retirement benefits, given that drafters "knew how to refer to the future," as evidenced by their reference to future taxes). In other words, the text of Article IX, section 3a, shows that the drafters knew how to refer to taxes levied on, or measured by, sales, and they did so in paragraph (1)(a), with respect to motor vehicle fuels, but not in paragraph (1)(b), with respect to motor vehicles. The fact that a reference to taxes levied on, or measured by, sales is clearly included in paragraph (1)(a) and clearly omitted from paragraph (1)(b) indicates that the voters would have understood and intended the constitutional provision to apply to taxes based on, or **421 measured by, sales of motor vehicle fuel, but not taxes based on, or measured by, sales of motor vehicles.
Second, the text shows that the drafters knew how to create a broad category of taxes, and they did so in paragraph (1)(a), but not in paragraph (1)(b), which would have indicated to the voters that paragraph (1)(b)'s reference to taxes levied on the ownership of motor vehicles is not as encompassing as petitioners contend. To explain, paragraph (1)(a) refers to any tax levied "on, with respect to, or measured by " certain bases, whereas paragraph (1)(b) refers only to any tax levied "on " certain bases. That difference indicates that, although paragraph (1)(b) applies to all taxes levied "on" the ownership of motor vehicles, it does not apply to all taxes levied "with respect to, or measured by" the ownership of motor vehicles. That, in turn, indicates that, as used in Article IX, section 3a, taxes "on" the ownership of a motor vehicle are limited to those based on the fact of ownership itself-that is, ownership qua ownership-and they do not include taxes based on all actions that an owner might take, such as selling or buying. In other words, as Attorney General Thornton concluded in 1956 when determining the scope of former Article IX, section 3 (1942), " 'the word "ownership" was intended in the sense normally used in relation to ad valorem taxes where the source of tax liability is the "ownership" of property with all its incidents.' " 28 Op. Atty. Gen. 20, 21 (1956).[7]
*78 **422 2. Legislative History of Article IX, Section 3a
The legislative history of Article IX, section 3a, supports that interpretation. As mentioned, the relevant text of Article IX, section 3a, was first adopted by the voters in 1942 as former Article IX, section 3 (1942). The legislature referred the provision to the voters as a constitutional amendment, and a legislative committee drafted the only argument in the voters' pamphlet describing the provision.
In that argument, the committee explained that the referral "raises this question for the people of Oregon to answer: "Shall the Constitution be amended to guarantee that the gasoline, diesel fuel, ton mile and other taxes paid only by motor vehicle users be used for highways, roads and streets, and for the other closely related purposes now provided by law?" Official Voters' Pamphlet, General Election, Nov. 3, 1942, 11 (internal quotation marks omitted). According to the committee, the answer was "yes," and the purpose of the amendment was "to re-assert and to write into the constitution of this state, the principle underlying the gasoline tax and the other taxes on motor vehicle users which is, that the revenues from these taxes and imposed ONLY on such users should be devoted solely to highway purposes." Id. (uppercase in original). Throughout the argument, the committee referred to the taxes at issue as "user" taxes. Specifically, it described them as "taxes on motor vehicle users," "taxes paid only by motor vehicle users," "special highway user taxes," and "special taxes on users of the highway." Id. The committee contended that the amendment was necessary to protect highway users from unfair taxation, explaining that other states had expended funds from "the gasoline tax or the registration fee or both" for non-highway purposes, which was
"wholly unjust to the motor vehicle user for, like his fellow taxpayers, he paid real and personal property taxes, income taxes, gift taxes, school taxes, water taxes, sales taxes, and all the rest, and IN ADDITION these special highway taxes, which he fully expected would be used on the highways."
Id. (uppercase in original). The committee asserted, "It is unfair and unjust to tax motor vehicle transportation unless **423 the proceeds of such taxation are applied to highways." Id . (internal quotation marks omitted). In keeping with its repeated descriptions of the taxes at issue as user taxes, the only taxes that the committee specifically mentioned were the gasoline, diesel fuel, ton mile, and registration taxes.
The parties in this case disagree about what the legislative history of Article IX, section 3a, indicates. Petitioners argue that it shows that Article IX, section 3a, paragraph (1)(b), applies to all taxes based on a "status or activity involving a motor vehicle." In their view, it applies to all taxes that are likely to be passed on to highway users.
For its part, respondent argues that the legislative history shows that Article IX, section 3a, was intended to ensure that, "when citizens paid taxes attributable to their use of public roads for motor vehicle transportation, the revenue from those taxes would be devoted solely to the construction and maintenance of those public roads." Therefore, respondent argues, Article IX, section 3a, applies only to taxes "that are-unlike sales taxes on vehicles-directly attributable to the use of public roads." See 40 Op. Atty. Gen. 59 (1979) (distinguishing between a "direct tax" and "an indirect burden reflected in the price of goods or services").
We conclude that the legislative history establishes that Article IX, section 3a, was intended to apply to "special highway user taxes," as the legislative committee explained in its argument in support of the provision. It was intended to promote fair and equitable taxation by dedicating taxes paid only by highway users-meaning, as respondent argues, taxes attributable to the use of public highways for motor vehicle transportation-to highway purposes. The committee repeatedly emphasized that the provision would apply to taxes on highway users, and the only taxes that it mentioned were taxes paid in connection with the use of public highways. Thus, it appears that Article IX, section 3a, was intended to apply only to taxes including, and similar to, the following: fuel taxes (such as gasoline and diesel taxes); ownership taxes (such as title and registration fees, which must be paid as prerequisite *79 to public highway use); operation taxes (such as driver's license fees); and use taxes (such as ton mile taxes). **424 Petitioners' argument that the legislative history shows that Article IX, section 3a, applies to all taxes based on a "status or activity involving a motor vehicle" is unavailing. The legislative history indicates that the provision applies to special highway user taxes; it does not indicate that the provision applies to all taxes (for example, any business, license, regulatory, income, or property tax) imposed on a status or activity involving motor vehicles (for example, selling, repairing, painting, or disposing of motor vehicles).
C. Whether the Section 90 Tax is Subject to Article IX, Section 3a
Having concluded that, for the purposes of Article IX, section 3a, taxes "on the ownership *** of motor vehicles" are limited to those based on the status of motor vehicle ownership, we conclude that the Section 90 tax at issue in this case is not subject to Article IX, section 3a, because it is not based on the status of motor vehicle ownership. By its own terms, the Section 90 tax is a tax on the activity of engaging in the business of selling certain motor vehicles at retail, and, although the legislature's identification of the taxed activity is not dispositive, it is an important factor in determining the nature of the tax. See Sproul v. State Tax Com. , 234 Or. 579, 581, 383 P.2d 754 (1963) (the legislature's label of a levy is an important, but not conclusive, factor in determining into what category to place the levy). In addition, the tax is not triggered by ownership of a motor vehicle. A person can own a vehicle without ever being liable for the tax; only vehicle dealers are liable for the tax. And, a vehicle dealer may own, operate, and use a motor vehicle (on its lot or on public highways) without having to pay the tax; the tax is not triggered until the dealer sells the vehicle. As amicus curiae points out, "a vehicle dealer that owns motor vehicles but does not sell any during a reporting period does not incur any [Section 90] tax liability for that period." Thus, the tax is not defined as, and does not function as, a tax based on the status of ownership.
In addition, the Section 90 tax is unlike the taxes to which Article IX, section 3a, was intended to apply. As discussed above, the principle underlying Article IX, section 3a, is that special taxes paid only by highway users should **425 be used only for highway purposes. Thus, Article IX, section 3a, was intended to apply to taxes that are attributable to the use of the public highways for motor vehicle transportation, and the Section 90 privilege tax is not such a tax.
The fact that the legislature also enacted the Section 91 use tax, based on "the storage, use or other consumption in this state of taxable motor vehicles purchased at retail from any seller," and provided that the Section 91 use tax would be offset by any privilege tax imposed on the purchase does not compel a different conclusion. It appears that, as amicus curiae explains, the purpose of the Section 91 use tax is to protect Oregon vehicle dealers from losing business to non-Oregon vehicle dealers, who are not subject to the Section 90 tax. Thus, it appears that the Section 90 and Section 91 taxes work together, so that the Section 90 privilege tax can be imposed on in-state vehicle dealers without placing them at a competitive disadvantage to out-of-state vehicle dealers, which supports the conclusion that the Section 90 tax is a business privilege tax.
Therefore, exercising the jurisdiction that the legislature has given us to resolve the question, we hold that the Section 90 tax is not a tax "on the ownership, operation or use of motor vehicles," as that phrase is used in Article IX, section 3a.
The tax imposed by Oregon Laws 2017, chapter 750, section 90, is not subject to Article IX, section 3a, of the Oregon Constitution.

Section 90 provides:
"(1) A tax is imposed on each vehicle dealer for the privilege of engaging in the business of selling taxable motor vehicles at retail in this state.
"(2) The privilege tax shall be computed at the rate of 0.5 percent of the retail sales price of the taxable motor vehicle. ***
"(3)(a) A vehicle dealer may collect the amount of the privilege tax computed on the retail sale price of a taxable motor vehicle from the purchaser of the taxable motor vehicle.
"(b) Notwithstanding paragraph (a) of this subsection, the purchaser of a taxable motor vehicle from whom the privilege tax is collected is not considered a taxpayer for purposes of the privilege tax imposed under this section."

ORS 744.850(5) provides:
" 'Vehicle' means an automobile, van, minivan, sports utility vehicle, cargo van, recreational vehicle, motorcycle, all-terrain vehicle, trailer, pickup truck or truck with a gross vehicle weight of less than 26,000 pounds that does not require a commercial driver license to operate."
ORS 801.210 provides:
" 'Commercial vehicle' means a vehicle that:
"(1) Is used for the transportation of persons for compensation or profit; or
"(2) Is designed or used primarily for the transportation of property."

Oregon Laws, chapter 750, provides that the Department of Revenue shall deposit revenue from Section 90 tax in a "suspense account established *** for the purpose of receiving the revenue" and then, after payment of expenses, the balance of the moneys received shall be transferred to the Zero-Emission Incentive Fund and the Connect Oregon Fund. Or. Laws 2017, ch. 750, § 96(1), (2)(a). Specifically, it provides that "$12 million shall be transferred annually to the Zero-Emission Incentive Fund" and "the balance of the moneys shall be transferred to the Connect Oregon Fund." Id . § 96(2)(a).
The Zero-Emission Incentive Fund was established as part of the same law that established the Section 90 tax. Or. Laws 2017, ch. 750, § 152. Moneys in the fund are to be used for rebates to purchasers of qualifying vehicles. Id. § 152(6); see id. §§ 149, 150. The Connect Oregon Fund is governed by ORS 367.080, subsection (3) of which provides that moneys in the fund shall be used "to provide grants for transportation projects" and that such grants "may be provided only for projects that involve one or more of the following modes of transportation: (a) Air; (b) Marine; (c) Rail; and (d) Bicycle and pedestrian." The State Highway Fund is governed by ORS 366.505, which identifies the composition of the fund and provides that the fund "shall be deemed and held as a trust fund, separate and distinct from the General Fund, and may be used only for the purposes authorized by law." ORS 366.505(2).

Amicus curiae explains that "[t]he use tax addresses the concern that, if Oregon residents purchase taxable motor vehicles in other states, vehicle dealers in those states will have an advantage over Oregon vehicle dealers that are subject to the privilege tax."

The only change made in 1980 to the 1942 provision's description of the two categories was a formatting change. In the 1942 provision, the categories were listed in a single subsection, without any paragraphs, but in the 1980 provision, that subsection was divided into paragraphs, with each category listed in its own paragraph. As set out above, paragraph (1)(a) applies to certain motor vehicle fuel taxes and paragraph (1)(b) applies to certain motor vehicle taxes.

Article IX, section 3a, has been amended twice since 1980, but those amendments did not alter the text at issue and are not relevant to this case.

Attorney General Thornton reached that conclusion in an opinion concerning a proposed sales tax. See House Bill 694 (1955). The Attorney General was asked whether tax revenue based on sales of motor vehicles would be subject to former Article IX, section 3 (1942), as the proceeds of a tax based "on the ownership, operation or use of motor vehicles," and he concluded that it would not. Regarding taxes on the ownership of motor vehicles, the Attorney General reasoned:
"It cannot be denied that the right of a retailer to transfer title to property is an incident of ownership of such property. Consequently, the sale of an automobile, if taxed, is essentially a tax on a vital incident of ownership. Though this is undoubtedly true, it is nevertheless our opinion that the word 'ownership' was intended in the sense normally used in relation to ad valorem taxes where the source of tax liability is the 'ownership' of property with all its incidents. The retail sales tax, however, is not a tax on 'ownership' in any sense, including the right to transfer title. It is an excise or privilege tax on the right to engage in a particular business or profession."
28 Op. Atty. Gen. at 21; see also 34 Op. Atty. Gen. 424, 426 (1968) (reaching same conclusion in connection with a similar proposed privilege tax, which was to be calculated based on sales).