No. 1    February 1, 2024    1

IN THE SUPREME COURT OF THE
STATE OF OREGON

Tim KNOPP,
Daniel Bonham,
Suzanne Weber, Dennis Linthicum,
and Lynn Findley,
*Petitioners,*

*v.*

Lavonne GRIFFIN-VALADE,
Oregon Secretary of State,
Elections Division,
*Respondent.*

(CA A182122) (SC S070456)

On certification from the Court of Appeals under ORS 19.405.

Argued and submitted December 14, 2023.

John DiLorenzo Jr., Davis Wright Tremaine, LLP, Portland, argued the cause and filed the briefs for petitioners. Also on the briefs were Aaron K. Stuckey and Blake Robinson.

Dustin E. Buehler, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Steven C. Berman, Stoll Stoll Berne Lokting & Shlachter, P.C., Portland, filed the brief for *amici curiae* APANO, Basic Rights Oregon, Oregon AFSCME Council 75, Oregon Education Association, Oregon League of Conservation Voters, Accion Politica PCUNnista, Planned Parenthood Advocates of Oregon, and SEIU Local 503. Also on the brief was Lydia Anderson-Dana.

Margaret S. Olney, Bennet Hartman, LLP, Portland, filed the brief for *amici curiae* Andrea Kennedy-Smith and Reed Scott-Schwalbach.

Kelly Simon, American Civil Liberties Union of Oregon, Portland, filed the brief for *amicus curiae* American Civil

Liberties Union of Oregon. Also on the brief was Alicia LeDuc Montgomery.

Before Flynn, Chief Justice, and Duncan, Garrett, DeHoog, Bushong and James, Justices, and Walters, Senior Judge, Justice pro tempore.*

PER CURIAM

The Secretary of State's Temporary Rules ELECT 12-2023 and ELECT 16-2023 are upheld.

_____

  * Masih, J., did not participate in the consideration or decision of this case.

## PER CURIAM

In 2022, voters approved Ballot Measure 113, which amended Article IV, section 15, of the Oregon Constitution. That amendment provides that any state legislator who accrues 10 or more unexcused absences during a legislative session shall be disqualified from holding legislative office "for the term following the election after the member's current term is completed." Or Const, Art IV, § 15.

The parties in this proceeding dispute the timing of the disqualification imposed by that amendment. In rules promulgated to implement the amendment, the Secretary of State has applied the disqualification to a legislator's next term of office—that is, the term immediately following the term in which the legislator accrued 10 or more unexcused absences. Petitioners are legislators who each accrued 10 or more unexcused absences during the 2023 legislative session. They challenge the secretary's rules, contending that the disqualification should apply one term later—that is, that a legislator who accrues 10 or more unexcused absences during a legislative session should be allowed to serve the next term of office, but not the term after that.

The resolution of that dispute requires that we apply our well-established methodology to construe the text of the amendment, by determining how the voters who adopted the amendment most likely understood its text, including considering the information presented to the voters through the ballot title and in the voters' pamphlet. That information expressly and repeatedly described the disqualification as occurring immediately following the legislator's current term. Petitioners concede that that information supports the secretary's interpretation and not their own. Nevertheless, petitioners argue that what they view as the plain meaning of the amendment's text must control. They contend that the text clearly applies the disqualification to the term after the next term of office and is not capable of supporting the secretary's interpretation.

As we will explain in greater detail, we disagree. Contrary to petitioners' argument, the text is capable of supporting the secretary's interpretation. And that interpretation

is uniformly supported by the ballot title and the voters' pamphlet, both of which inform voters' understanding of ballot measures. Reading the text of the amendment in light of the ballot title and the voters' pamphlet, voters would have understood the disqualification to apply to the term of office immediately following the term in which a legislator accrued 10 or more unexcused absences. Thus, for the reasons that follow, we conclude that voters intended that result and reject petitioners' challenge to the secretary's rules.

## I.    BACKGROUND

Each chamber of the Oregon Legislative Assembly may conduct business only if two-thirds of the chamber's members are present. Or Const, Art IV, § 12. In some circumstances, therefore, a minority of legislators may prevent a chamber from conducting business by not being present. That practice is commonly known as a legislative walkout. Although legislators have used walkouts throughout Oregon's history, the frequency of walkouts has increased in recent years.

Measure 113 was designed to curtail legislative walkouts. To do so, the measure proposed amending Article IV, section 15. Before the amendment, that constitutional provision authorized either chamber of the legislature to "punish its members for disorderly behavior" and, "with the concurrence of two thirds, [to] expel a member." Or Const, Art IV, § 15 (2020). Measure 113 proposed adding the following words:

> "Failure to attend, without permission or excuse, ten or more legislative floor sessions called to transact business during a regular or special legislative session shall be deemed disorderly behavior and shall disqualify the member from holding office as a Senator or Representative *for the term following the election after the member's current term is completed*."

(Emphasis added.)

Measure 113 originated as an initiative petition, for which the Attorney General must prepare a draft ballot title and then, following a comment period, a certified ballot title. ORS 250.065 - 250.067. The ballot title for a state measure

consists of three parts: (1) a caption of not more than 15 words that reasonably identifies the measure's subject matter; (2) simple and understandable statements of 25 words or less that describe the results of a "yes" vote and a "no" vote; and (3) a concise and impartial statement of not more than 125 words that summarizes the measure and its major effect. ORS 250.035(2).

The certified ballot title plays an important role in the initiative process. The ballot itself—that is, the document that voters use to cast their votes—is required to include the caption and the result statements of the certified ballot title. ORS 254.175(2). Counties also may choose to print the full ballot title, including the summary. ORS 254.145(7).

For the initiative petition that became Measure 113, the Attorney General prepared a draft ballot title, which became the certified ballot title after it was neither revised (following a comment period) nor challenged in this court.[1] Each part of the ballot title addressed the timing of the proposed disqualification, stating that the measure would disqualify a legislator from holding legislative office for the term immediately following the term in which the legislator accrued 10 or more unexcused absences during a legislative session. The ballot title caption provided:

> "**Amends Constitution**:  Legislators with ten unexcused absences from floor sessions disqualified from holding *next term of office*."

(Emphasis added.) The result statements provided:

> "**Result of 'Yes' Vote**:  'Yes' vote disqualifies legislators with ten unexcused absences from legislative floor sessions from holding office as legislator for *term following current term of office*.

> "**Result of 'No' Vote**:  'No' vote retains existing law. Absent legislators may be punished by legislative chamber (potentially expelled by supermajority); present legislators have legal authority to compel attendance."

---

[1]  As noted, the Attorney General first prepares a draft ballot title, which is subject to a public comment period. ORS 250.067(1). Following any revisions by the Attorney General, any elector who submitted a timely comment on the draft may challenge the ballot title by petitioning this court. ORS 250.085(2).

(Emphasis added.) And the summary provided, in relevant part:

> "Measure specifies that 'disorderly behavior' includes legislator's failure to attend ten or more legislative floor sessions during a regular or special legislative session without permission or excuse. Under measure, legislator who engages in 'disorderly behavior' through unexcused absences is disqualified from serving as a Senator or Representative for *the term following the end of the legislator's current term*."

(Emphasis added.)[2]

More information about Measure 113 was provided to voters in the voters' pamphlet, which is sent to every household with a registered voter. OAR 165-022-0060(7). The voters' pamphlet contained the full text of Measure 113 and the full ballot title—both set out above—as well as an explanatory statement and arguments that advocates submitted on the merits of the measure. ORS 251.185(1); Official Voters' Pamphlet, General Election, Nov 8, 2022, 65-71.[3]

The explanatory statement is "an impartial, simple and understandable statement explaining the measure" in 500 words or less. ORS 251.215(1). The explanatory statement is approved by a committee of five members: two proponents of the measure, two opponents of the measure, and a fifth member chosen either by the four other members or by the Secretary of State. ORS 251.205(2)-(5). In this case, all five members of the committee voted to approve the explanatory statement that appeared in the voters' pamphlet. *See* ORS 251.215(4) (requiring statement to show dissenting votes, if any); Official Voters' Pamphlet at 66 (showing no members dissented or were absent). Like the ballot title, the explanatory statement characterized the measure as disqualifying a legislator from holding legislative office for the term immediately following the term in which the legislator accrued 10 or more unexcused absences:

---

[2] Two people submitted comments on the Attorney General's draft ballot title during the public comment period. Neither comment challenged how the ballot title characterized the timing of the disqualification that would be created by the measure.

[3] Page cites to the Official Voters' Pamphlet refer to the pamphlet circulated to Marion County voters.

> "The measure deems the failure to attend without excuse to be disorderly behavior and *disqualifies the legislator from holding office after the legislator's current term ends.*"

Official Voters' Pamphlet at 66 (emphasis added).[4]

As noted, the voters' pamphlet also included numerous arguments that advocates submitted on the merits of the measure. By either paying a $1,200 fee or obtaining signatures from 500 voters, any person or organization may submit a written argument—not exceeding 325 words—supporting or opposing the measure for publication in the voters' pamphlet. ORS 251.255(1)-(2); ORS 251.255(4); OAR 165-022-0050(5). The voters' pamphlet for the 2022 election contained 19 advocate arguments—each supporting Measure 113, and none opposing it. While not all the arguments addressed the timing of the proposed disqualification, those that did described it as disqualifying a legislator from holding legislative office for the term immediately following the term in which the legislator accrued 10 or more unexcused absences. Official Voters' Pamphlet at 67-71.[5]

Media coverage of Measure 113 was consistent with the statements in the ballot title and voters' pamphlet. The secretary has cited numerous media accounts that described the measure as disqualifying a legislator with 10 or more unexcused absences during a legislative session from holding office during the next term of office.[6] For their

---

[4] The explanatory statement is subject to a public hearing, ORS 251.215(2), and possible challenge in this court, ORS 251.235(1). No challenge to the explanatory statement for Measure 113 was filed in this court; the record before us does not reveal whether a public hearing was held, and if so, what happened at any such hearing.

[5] *See, e.g.*, Official Voters' Pamphlet at 68 (argument submitted by Tan Perkins, Vote Yes On 113) ("It would create a consequence for lawmakers who skip 10 sessions without an excuse, by banning them from holding their seat the following term."); Official Voters' Pamphlet at 70 (argument submitted by Heather L. Stuart, Fair Shot For All Coalition) ("Under Measure 113, if a politician has 10 or more unexcused absences, they will be barred from holding their office the following term.").

[6] *See, e.g.*, Claire Withycombe, *Midterm ballot measure to decide if Oregon lawmakers will be punished for absences*, Statesman Journal, (Sept 19, 2022), https://www.statesmanjournal.com/story/news/politics/2022/09/19/2022-oregon-midterm-election-ballot-measure-113-walk-outs-republicans/66152421007/ (accessed Jan 25, 2024) (reporting that the measure "would disqualify state lawmakers from holding office for the next term" if they accrued enough absences); Editorial Board, *Voters can already remove legislators for unexcused absences*,

part, petitioners have not identified any media accounts suggesting that the timing of the disqualification would work differently.

At the November 2022 General Election, voters approved Measure 113, thus amending Article IV, section 15, to add the new disqualification. The total vote count was 1,292,127 to 599,204, with 68.3 percent voting in favor and 31.7 percent voting in opposition. The parties report that, during the 2023 legislative session, which was the first session after the amendment took effect, 10 senators accrued 10 or more unexcused absences and that petitioners were among those senators.

In August 2023, the secretary adopted temporary administrative rule ELECT 12-2023 to, among other things, implement the amendment for the 2024 General Election. That rule adopted, and incorporated by reference, the *State Candidate Manual*, which applied the amendment's disqualification to the term of office immediately following the term in which the legislator accrued too many unexcused absences. Specifically, the rule provided that candidates for state representative and state senator "must not have 10 or more unexcused absences from legislative floor sessions during a regular or special legislative session to be eligible *for the term immediately following their current term*." *State Candidate Manual* 10 (rev Aug 2023) (emphasis added). In September 2023, the secretary suspended that rule and adopted a revised version of the *State Candidate Manual* through temporary administrative rule ELECT 16-2023. No changes were made to the section of the revised *State Candidate Manual* implementing the amendment. *State Candidate Manual* 10 (rev Sept 2023). Accordingly, the more recent rule similarly applies the disqualification to the immediate next term of office.

Petitioners challenged both rules in the Court of Appeals under ORS 183.400, arguing that the rules violate Article IV, section 15, by applying the disqualification to the next term of office, rather than the term after that. The

Bend Bulletin, (Sept 13, 2022), https://www.bendbulletin.com/opinion/editorial-voters-can-already-remove-legislators-for-unexcused-absences/article_152d-30ca-3387-11ed-bb34-2f960479e9bd.html (accessed Jan 25, 2024) (reporting that disqualified legislators would be barred "from holding office in the term following the current term").

Court of Appeals certified the matter to this court under ORS 19.405, and we accepted the certification.

## II.   DISCUSSION

As amended by the voters' approval of Measure 113, Article IV, section 15, now disqualifies legislators with 10 or more unexcused absences from holding a future term of office:

> "Failure to attend, without permission or excuse, ten or more legislative floor sessions called to transact business during a regular or special legislative session shall be deemed disorderly behavior and *shall disqualify the member from holding office as a Senator or Representative for the term following the election after the member's current term is completed.*"

(Emphasis added.) The dispute in this case centers on whether the disqualification applies to the immediate next term of office, as the secretary argues, or the term after that, as petitioners argue.

Resolving that dispute presents a question of interpretation. We interpret the Oregon Constitution by "examin[ing] the text, in its historical context and in light of relevant case law, to determine the meaning of the provision at issue most likely understood by those who adopted it, with the ultimate objective of identifying relevant underlying principles that may inform our application of the constitutional text to modern circumstances." *Couey v. Atkins*, 357 Or 460, 490-91, 355 P3d 866 (2015).[7] Therefore, when interpreting a constitutional amendment adopted through an initiated ballot measure, we consider "the voters' intent," focusing on the text and context as well as "the measure's history, should it appear useful to our analysis." *State v. Algeo*, 354 Or 236, 246, 311 P3d 865 (2013). A measure's history includes the ballot title, other materials in the voters' pamphlet, and media reports. *AAA Oregon/Idaho Auto Source v. Dept. of Rev.*, 363 Or 411, 418, 423 P3d 71 (2018).

We begin with the text. The amendment applies to members of the legislature and provides that a member's

---

[7] The amendment at issue in this case does not require identifying underlying principles that must be applied to modern circumstances, because the voters adopted this amendment in November 2022.

failure to attend 10 or more legislative floor sessions without excuse "shall disqualify the member from holding office as a Senator or Representative for *the term following the election after the member's current term is completed.*" Or Const, Art IV, § 15 (emphasis added). As an initial matter, the parties agree that "term" refers to a legislator's term of office. In Oregon, senators are elected to a four-year term of office, while representatives are elected to a two-year term of office. Or Const, Art IV, § 4. The parties also agree that "the member's current term" refers to the term of office in which a legislator accrues 10 or more unexcused absences during a legislative session.

        The parties disagree, however, as to the term for which the legislator would be disqualified from holding office—whether it is the term immediately following the legislator's current term or the term after that. Their differing interpretations depend on the interplay between the distinct phrases used in the text of the amendment.

        Petitioners interpret the amendment to mean that a legislator who accrues 10 or more unexcused absences would be allowed to serve the next term of office but would be disqualified from holding office for the term after that. To get there, petitioners read the amendment so that the words "the term" are modified by "following the election," and then the words "the election" are modified by "after the member's current term is completed." According to petitioners, to identify "the term following the election after the member's current term is completed," we should begin by identifying when the legislator's current term is completed, then identify the election after that, and then identify the term that follows that election.

        For example, as petitioners posit, if a senator accrues 10 or more unexcused absences during a legislative session in a four-year term that begins in January 2021, then the senator's "current term is completed" in January 2025. *See* Or Const, Art IV, § 4 (a legislative term shall commence on the second Monday in January following the legislator's election). Petitioners argue that the phrase "the election after the member's current term is completed" should be understood to refer to the first general election

for the legislator's office held after the legislator completes their current term. That election would take place during the next term of office because general elections are held in November of the year before a new term begins. So, if a senator's current term is completed in January 2025, then the next general election for that senate office would take place in November 2028, for the term beginning in January 2029.[8] And if "the election after the member's current term is completed" refers to the November 2028 General Election, then "*the term following* the election after the member's current term is completed" must refer to the term that begins after that election—namely, the term beginning in January 2029. So, according to petitioners, a senator who accrued 10 or more unexcused absences during the 2023 legislative session and whose term of office would end in January 2025 would be allowed to serve during the next term of office—beginning in January 2025—but would be disqualified from holding legislative office for the term after that—beginning in January 2029.

The secretary interprets the amendment's text differently. She interprets the text to mean that a legislator who accrues 10 or more unexcused absences would not be allowed to serve the immediate next term of office. In her view, the words "the term" (for which a legislator is disqualified) are modified by *both* the phrase "following the election" *and* the phrase "after the member's current term is completed." As a result, whereas petitioners understand the phrase "after the member's current term is completed" to modify the words "the election," the secretary understands the phrase "after the member's current term is completed" to modify the words "the term." She maintains that reading the amendment that way emphasizes two facts about the term of disqualification: that it follows an election, and that it occurs after the disqualified legislator completes their current term. The secretary thus understands the term "after the member's current term is completed" to refer to the term immediately following the term in which a legislator accrues 10 or more unexcused absences.

---

[8] For a member of the Oregon House of Representatives whose term ends January 2025, the next general election after that term is completed would be in November 2026, for a term beginning January 2027. Or Const, Art IV, § 4.

Applying that interpretation to the same example from above, if a senator accrues 10 or more unexcused absences during a legislative session in a four-year term that begins in January 2021, then the senator's "current term is completed" in January 2025. The term immediately following that term would also begin in January 2025; the election to decide who would serve in that following term would be held in November 2024. The senator would be disqualified from holding legislative office for the term of office that both follows the November 2024 election and completion of the senator's current term of office—that is, the term beginning in January 2025.

The text of the amendment does not unambiguously support either interpretation. The text would more clearly support petitioners' reading—and weaken the secretary's reading—if it referred to "the term following the election [*that occurs*] after the member's current term is completed." Without those bracketed words, the intended interplay among the distinct phrases in the amendment is less immediately apparent, and the secretary's reading gains plausibility. Still, petitioners are not wrong to argue that their proposed reading is supported by certain interpretative principles. Namely, it conforms with two canons of construction: the rule against surplusage, which provides that we interpret a provision's text to give effect to every word and avoid redundancy, *State v. Clemente-Perez*, 357 Or 745, 755, 359 P3d 232 (2015); and the doctrine of the last antecedent, which provides that "'[r]eferential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent,'" *State v. Webb*, 324 Or 380, 386, 927 P2d 79 (1996) (quoting Norman J. Singer, 2A *Sutherland Statutory Construction* § 47.33 at 270 (5th ed 1992)); *see also AAA Oregon/Idaho Auto Source*, 363 Or at 418 (explaining that, when examining constitutional text, "we apply rules of construction that bear directly on the provision's interpretation").

Under the secretary's interpretation, the amendment to Article IV, section 15, would contain a redundancy, because the amendment would have the same legal effect even if the words "following the election" were deleted from

the text—it would disqualify the "Senator or Representative for the term \*\*\* after the member's current term is completed." The secretary contends that the redundancy highlights a fact that might otherwise not be apparent to the voters—that a legislator's disqualification takes effect only after the election to replace them has occurred and not before the newly elected person can take office.

The secretary's interpretation also creates tension with the doctrine of the last antecedent because it does not treat the modifying phrase "after the member's current term is completed" as modifying the words immediately preceding it, "the election." Instead, the secretary reads the phrase "after the member's current term is completed" as modifying the words "the term." The secretary acknowledges that her interpretation would be clearer if a comma separated the phrases "following the election" and "after the member's current term is completed." Petitioners' interpretation does not present a similar difficulty.

Canons of construction, however, are merely guidelines for interpreting text that, in any given case, may give way to contrary evidence of intent. *See State v. Lane*, 357 Or 619, 629, 355 P3d 914 (2015) (describing canons of construction as "mere assumptions that always give way to more direct evidence of legislative intent"); *see also State v. Cloutier*, 351 Or 68, 97, 261 P3d 1234 (2011) ("[T]he fact that a proposed interpretation of a statute creates some measure of redundancy is not, by itself, necessarily fatal. Redundancy in communication is a fact of life and of law."); *Thomas Creek Lumber and Log Co. v. Dept. of Rev.*, 344 Or 131, 138, 178 P3d 217 (2008) (adopting interpretation of a tax statute that made "some words \*\*\* redundant," noting that "nothing prohibits the legislature from saying the same thing twice"); *Johnson v. Craddock et al*, 228 Or 308, 316, 365 P2d 89 (1961) (stating that the "doctrine of the last antecedent is not inflexible and is never applied when a further extension is clearly required by the intent and meaning of the context or when to apply a grammatical rule literally would lead to an absurd or unreasonable result, defeating the legislative purpose").

For example, both the rule against surplusage and the doctrine of the last antecedent gave way to ballot measure history in *Lipscomb v. State Bd. of Higher Ed.*, 305 Or 472, 753 P2d 939 (1988). In that case, we were required to interpret a referred constitutional amendment that provided the governor with the authority to veto "any provision in new bills declaring an emergency." Or Const, Art V, § 15a. The defendants interpreted the amendment broadly to mean that, in new bills that contained a provision declaring an emergency, the governor could veto *any* provision within the bill, not only the provision declaring an emergency. The plaintiffs, by contrast, interpreted the amendment narrowly to mean that the governor could veto only the provision that declared an emergency in a new bill. In support of their interpretation, the plaintiffs argued that the word "provision" was modified by both "in new bills" and "declaring an emergency." 305 Or at 485. The defendants countered that the plaintiffs' interpretation created a redundancy because the phrase "in new bills" would have no legal effect—all bills presented to the governor are new bills. *Id.* The defendants further pointed out that their interpretation conformed with the doctrine of the last antecedent, under which the word "provision" was modified only by "in new bills," and the word "bills" was modified by "declaring an emergency." *Id.* The defendants, therefore, argued that their interpretation represented the unambiguous meaning of the amendment.

We concluded that the amendment was "not as unambiguous as defendants claim." *Id.* Ultimately, we held that the canons of construction must yield to the voter understanding demonstrated by the ballot measure history, including material in the voters' pamphlet, which supported the plaintiffs' interpretation. *See id.* at 486 ("Contemporaneous materials widely available to the voters in 1921, particularly the explanation by a committee of legislators in the official Voters' Pamphlet, leave no doubt that the amendment to Article V, section 15a, was intended to authorize the Governor to veto a declaration of emergency in a bill so as to protect the opportunity of voters to petition for a referendum.").

In this case, as the court did in *Lipscomb*, the secretary relies on the ballot measure history—in particular, the ballot title and explanatory statement—to determine how the voters would have understood the words used in the amendment to Article IV, section 15. As noted above, the ballot title caption and the result statements were printed on every ballot.[9] The ballot title caption expressly stated that a legislator with too many unexcused absences would be "disqualified from holding next term of office." The "yes" result statement characterized the amendment as disqualifying a legislator for the "term following current term of office." The voters' pamphlet contained both those statements as well as the ballot title summary, which stated that the disqualification would apply to "the term following the end of the legislator's current term." Official Voters' Pamphlet at 65. Also contained in the voters' pamphlet was the explanatory statement, which stated that the disqualification would prohibit "the legislator from holding office after the legislator's current term ends." *Id.* at 66.

Petitioners acknowledge that the ballot measure history materials uniformly support the secretary's interpretation. No statements that appeared on the ballot or in the voters' pamphlet support petitioners' interpretation. And the parties have not identified any media accounts prior to the election suggesting that anyone understood the amendment to allow a legislator to serve one more term before the disqualification would take effect. Nevertheless, petitioners contend that we must disregard the ballot measure history materials that contradict their proposed interpretation because, according to petitioners, the text of the amendment is capable of only one meaning—as disqualifying a legislator from holding office for the term after the next term.

If petitioners were correct that the text is capable of supporting only one meaning, then no ballot measure history could justify a different meaning. *Cf. State v. Gaines*, 346 Or 160, 173, 206 P3d 1042 (2009) ("When the text of a statute is truly capable of having only one meaning, no

---

[9] *See Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 575, 871 P2d 106 (1994) (Fadeley, J., concurring) (discussing the importance of the ballot title and results statements because they "are printed on the ballot used by every person who voted to adopt the initiative amendment").

weight can be given to legislative history that suggests—or even confirms—that legislators intended something different."). But we disagree with petitioners' assertion that the amendment in this case is capable of only one meaning. *See generally Lipscomb*, 305 Or at 485 ("[C]ourts rarely see disputes over interpretation when the opposing party cannot show a possible alternative reading of the words, which it claims to be correct in context.").

While petitioners' interpretation of the text may be the more grammatical reading, the text is capable of supporting the secretary's interpretation. The amendment at issue is a complex sentence. The parties' competing interpretations depend on how they understand the relationship between three phrases within the amendment: (1) "the term"; (2) "following the election"; and (3) "after the member's current term is completed." Or Const, Art IV, § 15. Those phrases have no single necessary relationship between them. As explained above, if the sentence had contained the additional phrase "that occurs" immediately after "the election," petitioners' reading would be more compelling. Without that or a similar phrase, the intended meaning of the sentence is more uncertain. The words "the term" may be modified by both the phrase "following the election" and the phrase "after the member's current term is completed," as the secretary argues. That is the same construction that this court applied in *Lipscomb*, concluding that one word was modified separately by the two phrases that followed it. *See* 305 Or at 485 (holding that "provision" was modified by both "in new bills" and "declaring an emergency"). Applying that construction here treats the two phrases—"following the election" and "after the member's current term is completed"—as emphasizing two different facts about the disqualification: that voters would retain the right to choose the person who would serve during the next term of office and that the disqualified legislator would be allowed to serve the remainder of the current term of office.

If we were required to choose between petitioners' and the secretary's interpretations based on the text alone, petitioners would have a strong argument that their reading is the better one. But we do not review the text in a

void. We instead seek to understand how voters would have understood the text in the light of the other materials that accompanied it. And those other materials expressly and uniformly informed voters that the amendment would apply to a legislator's immediate next terms of office, indicating that the voters so understood and intended that meaning.

In arguing against that conclusion, petitioners contend that the ballot measure history materials are categorically insufficient to overcome what they regard as the more natural way to read the amendment's text. Petitioners support that argument by relying on statements that this court made in *Northwest Natural Gas Co. v. Frank*, 293 Or 374, 648 P2d 1284 (1982). There, the court was asked to interpret a constitutional amendment that had been referred by the legislature and adopted by the voters through a ballot measure. The amendment dedicated the revenue from certain taxes to the Common School Fund. *Id.* at 378. Applying that ballot measure as it was drafted, however, would have disrupted funding for the Department of Energy, which was evidently not an effect that the legislature had considered or intended when it drafted the measure. *Id.* The court was asked to apply the ballot measure in a manner that would avoid that unintended consequence compelled by the text of the measure. In rejecting that argument, the court stated:

> "There is no reliable record of what the voters intended beyond the language of the amendment itself. There are no official committees, no minutes, no formal debates. Given the fact that it is the electorate, the ultimate sovereign, which has adopted the amendment to our Constitution, we are slow to go beyond the face of the enacted language into materials not presented to the public at large."

*Id.* at 381. Petitioners rely on those statements to argue that ballot measure history is entitled to little weight in interpreting constitutional amendments adopted by the voters.

We disagree with petitioners' reading of *Northwest Natural Gas*. As an initial matter, the court's statements in that case must be understood in the context of that case. The court was rejecting a specific argument based on the specific ballot measure history offered in that case—namely, that the legislators who had drafted the measure had not

considered the legal effect of the text that they chose. When the court referred to "materials not presented to the public at large," the court was referring to materials from legislative proceedings demonstrating that legislators never considered how the amendment would affect the Department of Energy's funding. *Id.* at 381.

Further, in *Lipscomb*, this court expressly rejected reading *Northwest Natural Gas* as imposing broad methodological constraints on our constitutional interpretation, noting that *Northwest Natural Gas* does not confine us "to historically blind exegesis" of constitutional text and that questions of constitutional interpretation "cannot be decided simply by parsing the words of the amendment." 305 Or at 484-85. Reading *Northwest Natural Gas* as imposing such constraints would be inconsistent with the court's practice, both before and after that decision, to routinely consider ballot measure history, "to the extent that it appears useful to our analysis." *AAA Oregon/Idaho Auto Source*, 363 Or at 418; *see, e.g.*, *Couey*, 357 Or at 490 (discussing recent case law on the role of ballot measure history); *State ex rel. Chapman v. Appling*, 220 Or 41, 68, 348 P2d 759 (1960) (noting that the court had "recognized in a number of cases that arguments in the official Voters' Pamphlet relative to measures submitted to the people may be resorted to as an aid to construction" and collecting cases); *Allen v. Multnomah County*, 179 Or 548, 562, 173 P2d 475 (1946) ("As the amendment was adopted by initiative, we turn to the 1912 Voter's Pamphlet as an aid to its interpretation."); *Turnidge v. Thompson*, 89 Or 637, 175 P 281 (1918) (reviewing the ballot title prepared by the Attorney General, noting that the ballot title "was printed upon the ballots submitted to the electorate").

Instead of making categorical judgments about the role of ballot measure history in our analysis, we assign weight based on the substance and probative quality of those materials. *See generally Gaines*, 346 Or at 172 ("[W]hether the court will conclude that the *particular* legislative history on which a party relies is of assistance in determining legislative intent will depend on the substance and probative quality of the legislative history itself." (Emphasis in original.)). Not all ballot measure history materials serve

the same role or are owed the same weight. *See, e.g.*, *State v. Sagdal*, 356 Or 639, 643, 343 P3d 226 (2015) (expressing caution in relying too heavily on statements in the section of voters' pamphlet containing arguments from advocates).

The ballot measure history materials on which the secretary relies in this case—namely, the ballot title (including the caption, the "yes" result statement, and the summary) and the explanatory statement—directly and unequivocally address the question at issue, each stating that the amendment would disqualify a legislator from holding office during the immediate next term of office. Further, those materials were widely distributed to the voters. As noted above, the ballot title caption and the result statements are required to be printed on the ballots, ensuring that they were visible to all voters. ORS 254.145(7); ORS 254.175(2). And the complete ballot title and the explanatory statement are included in the voters' pamphlet that is mailed to every household with a registered voter. OAR 165-022-0060(7).

Petitioners do not offer any ballot measure history materials that contradict those materials. Instead, they argue that those materials do not reflect how the voters would have understood the amendment because those materials neither were drafted by the voters nor purport to record the thoughts of voters. But petitioners misunderstand the role of the ballot title and explanatory statement. Those materials reflect voter understanding not because they *record* that understanding, but because they *inform* that understanding. For example, the purpose of the ballot title "is to guide and inform the voters." *Richardson v. Neuner*, 183 Or 558, 562, 194 P2d 989 (1948). Similarly, the explanatory statement is intended to be "an impartial, simple and understandable statement explaining the measure," ORS 251.215(1), drafted by a committee composed of members who both support and oppose the ballot measure, ORS 251.205(3)-(5). Here, the explanatory statement reveals that the drafting committee unanimously agreed to the construction of the amendment on which the secretary now relies.

Petitioners maintain, however, that we cannot assume that voters read and understood the ballot title and

explanatory statement. We disagree. We assume that voters have familiarized themselves with the issue that is presented on the ballot, just as we assume that legislators have familiarized themselves with the bills on which they vote. *See Anthony et al. v. Veatch et al.*, 189 Or 462, 498, 220 P2d 493 (1950) ("On the whole, in view of the jealous regard of the people for the initiative process and of the opportunities which exist for the voters to acquaint themselves with the background and merits of a proposed initiative measure, we are of the opinion that, in the construction of such measures, the courts should indulge the same presumption as to the knowledge of historical facts on the part of the people, as they indulge with reference to acts passed by the legislature."). The ballot title and explanatory statement are materials accessible to all voters attempting to familiarize themselves with a ballot measure.

Because the text is capable of supporting the secretary's interpretation, and considering the clear import of the ballot title and explanatory statement in this case, we agree with the secretary that voters would have understood the amendment to mean that a legislator with 10 or more unexcused absences during a legislative session would be disqualified from holding legislative office during the immediate next term, rather than the term after that. Petitioners' contrary interpretation fails to account for the ballot title and explanatory statement, which expressly and repeatedly described the disqualification as taking place during the next term. Voters would have understood the meaning of the amendment's text in light of those materials. The uniformity of those materials, and their availability to voters, persuades us that the voters would have understood the amendment to disqualify legislators with too many unexcused absences from holding office during the next term of office.

### III.   CONCLUSION

After considering the text and the ballot measure history of the amendment to Article IV, section 15, that voters approved in 2022, we conclude that the phrase "the term following the election after the member's current term is completed" refers to the term immediately following the

term in which a legislator accrued 10 or more unexcused absences during a legislative session. That construction is consistent with the secretary's interpretation of the amendment, as reflected in her temporary rules, ELECT 12-2023 and ELECT 16-2023.

The Secretary of State's Temporary Rules ELECT 12-2023 and ELECT 16-2023 are upheld.